UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

**THE MERIT GROUP, LLC,**                                    08 CV 3496 (JES)

                                        Plaintiff,

                                                            **AFFIDAVIT IN SUPPORT**
        -against-                                           **OF MOTION TO REMAND**

**SINT MAARTEN INTERNATIONAL**
**TELECOMMUNICATIONS SERVICES, NV**
**and THE TELEM GROUP, NV,**

                                        Defendants.

-----------------------------------------------------------------X

STATE OF NEW YORK   )
                                ss.:
COUNTY OF NEW YORK)


        Harvey M. Bloch, being duly sworn, deposes and says:

    1.    I am a principal of The Merit Group, LLC, a New York limited liability

company ("Merit" or "Plaintiff"); I am fully familiar with the facts set forth herein

and I make this affidavit in support of Merit's motion to remand this case back to

the New York State Supreme Court.

    2.    In making this Affidavit, I am relying not only upon my own personal

knowledge acquired over a two-year period of close involvement with many of

the principals of the Defendants, but also upon what is set forth at length about

the two Defendants in a Limited Offering Memorandum (the "LOM") which was

prepared during the course of Merit's rendition of financial consulting services to

the Defendants.

3.    Those services were rendered pursuant to a Financial Services

Agreement, dated August 31, 2006, by and among Plaintiff Merit and the two

Defendants, Smitcom and Telem (the "FSA", attached hereto as Exhibit "A").  It is

Merit's claim for a financial consulting fee due to it for said services under the

said FSA which is the subject of this suit.

4.    Several drafts of the LOM came to be generated and circulated during

2006-7 by and among counsel for the various parties.  In preparing those drafts,

counsel received and incorporated information deemed to be reliable by various

knowledgeable persons associated with the Defendants.  The most recent

accurate and complete version of the LOM, prepared in or about December 1,

2006, is attached hereto as Exhibit "B"

**Defendants Cannot Qualify as "Agencies" or "Organs" of the Government**

5.    I understand that Defendants may claim to qualify as "agencies" or

"organs" of the Government of Sint Maarten and that such status gives them the

right to remove Merit's suit to this Court.

6.    This claim is impeached by the LOM, which sets forth detailed information

as to the structure and operation of the Defendants, their parents and affiliates.

The information therein also addresses the various factors relevant to the inquiry

of whether Defendants are "agencies" or "organs" of the Government of Sint

Maarten (page references herein are to the pages of the LOM).

7.    The LOM confirms that, as of December 2006, the stock of the two

Defendants was directly owned by neither the Government of Sint Maarten nor

by any political subdivision thereof.  Rather, the stock of the Defendants was

owned by Sint Maarten Telecommunications Holding Company, N.V., a non-political entity created on November 6, 2006 ("Holding, N.V.") (LOM at 1, 29).[1]

8.   Accordingly, neither Defendant can qualify as an "agency or instrumentality of a foreign state" on the grounds of their stock being owned by a foreign state, as would be required by 28 USC 1603 (b)(2), in order for that Defendant to be able to seek removal of this case under 28 USC 1441(d).

9.   Notably, this non-ownership status would not have changed even if the securities offering contemplated under the LOM had been consummated.  The securities offered for sale under the LOM were "facilities revenue bonds", not any equity interests in the Defendants or in Holding, N.V.

10.   The failure of Defendants to qualify on the grounds of stock ownership by a foreign state does, however, raise the question of whether either or both of the Defendants can nonetheless qualify, in the alternative, as an 'organ' of a foreign state under 28 USC 1603(b)(2).  Notably, Defendants did not assert this ground as a purported basis for removal in their original papers submitted to this Court; Defendants relied instead on a claim of stock ownership by the Government of Sint Maarten.

11.   In anticipation that Defendants may nonetheless  try to utilize this alternative grounds, this affidavit  demonstrates that neither Defendant herein can qualify as an "organ" of the Government of Sint Maarten under 28 USC 1603 (b)(2), as that term has been construed by  applicable case law.

---

[1] It is my understanding that the status of the Defendants, as shown on the LOM, has not changed since December 2006.

12.  As the LOM shows, the Defendants were not created for any national or traditional governmental purpose.  Rather, they were, from inception, and still are, profit-making entities, set up solely to make money for the Government of Sint Maarten by seeking to commercially exploit the desire of the general population of Sint Maarten, and of other locales, for internet, telephone and cable television services and programming.  (LOM at 4.)

13.  The Island Government of Sint Maarten does not itself supervise, actively or passively, nor has it ever sought to supervise, the Defendants, either directly or through its wholly owned entity, Holding, N.V.   Although there is a Supervisory Board as to Holding, N.V. consisting of persons initially appointed by the Government, that Board acts in only a pro forma or figurehead capacity.  (LOM at 18, 29.)

14.  The Defendants themselves perform no regulatory, public good or other administrative/oversight functions; rather, they are independent commercial-type entities accountable only to the extent that their mission is to flow a bottom-line profit from their respective commercial activities and operations back to the Government of Sint Maarten.  (LOM at 2.)

15.  The persons who work for the Defendants as their employees are hired and paid for by the individual Defendants themselves.  "Public" employees, *i.e.*, those whose salaries are paid for by the Government, are not required to be used and are not, in fact, used.  (LOM at 31.)

16.  The Defendants possess no competitive edge by virtue of the fact that they are indirectly owned by the Government.  In fact, the Defendants are subject

to all or most of the same risk factors as any other private company competing in this area of commercial activity.  (LOM at 6, 7, 31-a to 34-a.)

17.  The various licenses which the Defendants do possess and operate under are generally non-exclusive in nature; *i.e.*, other private or publicly controlled telecommunication companies already have or can also acquire the same licenses and can equally compete for the same cable and telecommunication market share and business in St. Maarten.  Some of the licensees held by the Defendants are not even derived from the Government of St. Maarten; rather. they are or were derived from other foreign governments and/or from other unaffiliated local or foreign private companies.  In some instances, certain of these other competing telecommunication companies rent "capacity" on cable or fiber lines that are owned by the Defendants; in other instances, the Defendants themselves rent cable or fiber capacity from these other companies.  (LOM at 4, 6, 27-a to 34-a.)

18.  The Defendants are not treated as Government organs under the laws of Sint Maarten: They are neither tax-exempt nor exempt from suit.  In fact, the Defendants, rather than being accountable to the Government of Sint Maarten, actually bill the Government for the latter's use of the Defendants' cable and fiber services and programming and the Defendants collect usage fees from the Government for the various billings which they render in the ordinary course of their various business activities.  (LOM at 5, 6.)

19.  In sum, the Defendants are operated as profit-making ventures, not for the public good, but rather to exploit a market demand for cable, internet, telephone

and related telecommunication services.  In turn, Defendants neither need nor receive funding or other financial support from the Government of Sint Maarten. (LOM at 5, 6.)

20.  Finally, in the case of Defendant Telem, it may also fail to qualify as a separate legal entity, as is required by 28 USC 1603(b(1):  Telem appears to be a "d/b/a" name for three (3) separate legal entities operating together in a loose and unstructured business format.  See page 2 of Defendants" Notice of Removal, dated April 10, 2008.  (LOM at 34-a.)  Because Telem is unable to qualify as an "organ" or "agency" on this additional ground, this Court cannot assert subject matter jurisdiction over Telem under 29 USC 1441(d).

**The Forum Designation Provision in the FSA
Reflects the Parties' Intention to Exclude
a Federal Court from Hearing this Case**

21. I understand that if Defendants are unable to qualify as an "agency" or "organ" of the Government; they have nonetheless claimed a right to remove Merit's suit to this Court on the alternate grounds that it involves a citizen of one state and a citizen/subject of a foreign country.  While such diversity may confer subject matter jurisdiction on this Court, it does not resolve the issue of whether this Court has personal jurisdiction over the Defendants.  Here, Defendants have had no actual presence in or contacts with the State of New York for any court, State or federal, to acquire personal jurisdiction over them.  Accordingly, for this Court to obtain such jurisdiction, Defendants presumably will rely on the forum designation provision in Paragraph 10 of the FSA, which provides, *inter alia*, that the parties submit to the jurisdiction of "the courts of the State of New York."

22.   That provision is, however, unavailing to confer personal jurisdiction over the Defendants by this Court for two (2) reasons:

23.   First, it was not the intention of the parties to the FSA in August 2006 for this provision to apply to a federal court in the State of New York; the provision was only intended to apply to the State Courts, *i.e.*, Supreme, County and City Courts of the State of New York.

24.   In August 2006, when the FSA was still being negotiated by the parties, the Defendants were, at that time, still directly owned by the Government of Sint Maarten.  As such, each then appeared to qualify as an "agency" of a foreign sovereign state and such status, in August 2006, was a matter of significant concern to Merit.

25.   Defendants' "agency" status entitled them not only to possibly claim sovereign immunity from any suit by Merit to collect on its consulting fee, but, even if that status did not confer absolute immunity, Defendants, as then "agencies" of a foreign sovereign, would clearly have been entitled to remove any suit brought against them in State Court to the applicable federal court, under 28 USC 1441(d).  The problem was that, in doing so, Defendants would thereby have been able to avoid a trial by jury because, as I was advised, the aforesaid statute expressly so provides.  This possible loss of jury trial to hear any disputes, including one involving a consulting fee, was not acceptable to Merit.

26.   Merit was also concerned that once a federal court acquired jurisdiction to hear a dispute, the federal court might apply portions of federal law, rather than the law of New York State, to resolve the claim.  Merit's understanding was that

7

New York State law was favorable to it.  In addition, Merit had more familiarity with New York State courts and did not want federal laws to apply -- given that the Defendants were then agencies of a foreign sovereign and the FSA was made in Sint Maarten.

27.  Because of these concerns, Merit insisted, during the negotiations of the FSA in August 2006, that Defendants consent that any dispute under the FSA be heard only in the courts of New York State, and not in the federal courts. Defendants agreed -- partially because of Merit's insistence, and partially for their own reasons, one of which was that Defendants had their potential witnesses scattered over the Caribbean and they were not freely able to travel to New York. Thus, Defendants themselves wanted the greater discovery and trial scheduling flexibility perceived to be given by the State courts.

28.  To give further effect to these agreements, the parties also consented, in tandem therewith, to a choice of law provision in the FSA which required that the FSA "be governed by and construed in accordance with the laws of the State of New York, U.S.A."

29.  If Defendants had not agreed to these terms -- to have both the courts and the laws of the State of New York apply -- the ability of Merit to prevail on any suit for unpaid consulting fees would have been sufficiently difficult to maintain and Merit would not have entered into the FSA.

30.  Because it was the parties' mutual intention to not have a federal court hear any dispute arising under the FSA, Defendants should not be allowed to circumvent the intent of the forum designation and choice of law provisions in the

FSA by removing this suit to this federal court, which is located <u>in</u> New York, but which is not a part <u>of</u> New York State's court system.

31. Second, assuming that this Court believes there is a facial ambiguity in the forum selection provision, whereby it is susceptible to be read as applying to a federal court sitting in New York State (as well as to a State court), that ambiguity is the sole fault of Defendants: After reaching an agreement regarding having only the New York State courts hear any dispute under the FSA, and to apply only New York State law thereto, Defendants advised Merit that they would draft Paragraph 10 of the FSA, entitled "Dispute Resolution", in accordance therewith.

32. Because they were then agencies of the Government, Defendants told Merit that certain boilerplate or standardized language relative to dispute resolution was required by the Government to be included in commercial contracts made with US-based vendors, and that such language had to be inserted "as is" to the "Dispute Resolution" provisions of the FSA. Thus, Defendants became the drafters of that Paragraph.

33. Because Defendants, and not Merit, were the draftsmen of Paragraph 10 of the FSA, any ambiguity deemed to exist therein is their sole responsibility and, accordingly, that ambiguity should be held against them. This means that Paragraph 10 of the FSA should be read as applying only to the New York State Courts.

## **Conclusion**

34.  For all of the foregoing reasons, Plaintiff's motion to remand should be granted.   To recap these reasons:

35.  First, neither Defendant qualifies as an "organ" (or "agency") of the Government of Sint Maarten, under 28 USC 1441(a).

36.  Second, this Court lacks *in personam* jurisdiction over the Defendants; that is, suit could not have been originally brought against them by Merit in this Court due to Defendants' lack of any presence in or contacts with the State of New York.  The forum designation and choice of law provisions in Paragraph 10 of the FSA were not intended by the parties to confer personal jurisdiction on a federal court located in New York State to hear this case.

37.  Third, any ambiguities in the wording of Paragraph 10 of the FSA should be resolved against Defendants, as the draftsmen thereof.

38.  Fourth, I am advised by my Counsel that any doubts regarding removal to this Court should be resolved <u>against</u> such removal (see accompanying Aff. of Leonard N. Flamm).


**WHEREFORE**, it is respectfully requested that Plaintiff's motion to remand be granted in all respects, with applicable costs.

_____/s/ Harvey M. Bloch_
Harvey M. Bloch

Sworn to before me this
  7th    day of May, 2008


_____/s/ Leonard N. Flamm_____
      Notary Public
New York County
License No. 31-6326433
Exp. 11/30/2010

# FINANCIAL SERVICES AGREEMENT

THIS FINANCIAL SERVICES AGREEMENT ("Agreement") is made and entered into as of this 31st day of August, 2006, between Sint Maarten International Telecommunications Services, NV ("SMITCOMS"), with its principal place of business located at Falcon Drive #3, Harbour View, Phillipsburg, Sint Maarten, NA and TelEm ("TelEm"), with its principal place of business located at J.P. Craane Cruise Terminal Bldg., 2nd Floor – Yrausquin Blvd., Pointe Blanche, Sint Maarten, NA (hereinafter collectively referred to as "The Company Group")

and

The Merit Group, LLC, with its principal place of business located at 575 Lexington Avenue, Suite 400, New York, New York, 10022 USA (hereinafter referred to alternatively as "Merit" or "Consultant").

## RECITALS

WHEREAS, SMITCOMS is expanding its fiber optic submarine cable network that is operating pursuant to licenses and authorizations issued it by the Federal Communications Commission (USA), known as the SMPR-1 cable network and licensed pursuant to FCC File No. SCL-LIC 20031209-00033, ITC-214-20040128-00071;

WHEREAS, TelEm is expanding product offerings for and services to its customers;

WHEREAS, SMITCOMS and TelEm are affiliated in that each is 100% owned by the Government of the Island Territory of Sint Maarten, Netherlands Antilles, and have joined together under this Agreement for the purpose of increasing the possibility of securing desired financing;

WHERAS, The Company Group has engaged in conversations with The Merit Group in connection with a possible financing involving CITIBANK GROUP, New York and Trinidad;

WHEREAS, The Company Group is desirous of retaining the expertise of The Merit Group to secure the contemplated financing in connection with said CITIBANK;

WHEREAS, The Merit Group has expertise in providing such services in the area of finance and is desirous of providing assistance as described herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree and set forth as follows:

SMITCOMS N.V. Initial_____     TelEm Group Initial_____     The Merit Group Initial_____

1. **Definitions**. In addition to the terms defined elsewhere in this Agreement, the following terms shall have the meanings hereinafter indicated:

"Affiliate" means with respect to any person, any other person which, directly or indirectly, controls or is controlled by or is under common control with such person, whether by ownership of voting securities, by contract or otherwise.

"Closing" means the satisfaction of all conditions precedent resulting in the consummation of financing as approved by The Company Group.

"Party" means The Company Group (SMITCOMS and TelEm) or successors or assigns and The Merit Group.

"Package or Packaging" means the financial documents and related information that is to be prepared by The Merit Group for presentation to CITIBANK GROUP, New York and Trinidad during the term of this Agreement.

"Project" means all activities and enterprises for which The Company Group may request financial assistance from The Merit Group in connection with possible financing from said CITIBANK GROUP.

2. **Scope of Services**. The Consultant shall devise and recommend a strategy for obtaining Adequate Financing ("Financing Plan" or "Financing") under the Project, which includes the identification of governmental agencies, private entities, and financial institutions whose programmatic or financial participation could lead to its successful implementation of the financing desired by The Company Group as it may relate to the Project or said CITIBANK. Adequate Financing under this Agreement shall mean any loans or series of loans in the aggregate principal loan amount of approximately Seventy Five Million ($75 million) dollars, which shall be subject to final sizing, and otherwise consented to by The Company Group. The Merit Group shall deliver the following Package or Packaging in connection with the CITIBANK Project:

(a) Identify possible sources for providing debt financing for the Project involving said CITIBANK (including banks, mutual funds and other financial institutions) that may be involved in the contemplated financing.

(b) Assist in the preparation of and participate with The Company Group in the presentation of information (including general background information and specific financial plans) to said CITIGROUP or, as may be necessary, to rating agencies or other entities including, but not limited to, insurance companies, banks and other lending institutions.

(c) Advise The Company Group during negotiations with funding sources related to the CITIBANK Project by critiquing and evaluating Term Sheets and investment proposals received by The Company Group as may be necessary to consummate one or more financing transactions acceptable to The Company Group.

SMITCOMS N.V. Initial                    TelEm Group Initial                    The Merit Group Initial

2

(d) Work cooperatively with other third party consultants and advisors engaged by The Company Group to prepare valuation analyses, financial models, presentation materials and other reports or supporting documentation required to facilitate discussions and deliberations of the Project with prospective investors, strategic partners, The Company Group, their respective Boards of Directors or other third parties.

(e) Upon approval of a Financing Plan, assist The Company Group in its implementation and execution of said Financing Plan which includes, though is not necessarily limited, to assisting The Company Group in negotiations to obtain support or approval of the appropriate government agencies, private agencies, and financial institutions and assisting in the preparation of documentation that may be necessary to consummate funding under the Project.

Nothing contained herein shall be construed to require or otherwise authorize the Consultant, and The Company Group agrees, that the Consultant is neither understood nor expected to undertake any of the following:  (i) to purchase from The Company Group or arrange for the purchase of any security, (ii) to sell any security for The Company Group or otherwise act in connection with the distribution of any other security, or to engage in the business of effecting a transaction in any security, (iii) to participate or have a participation in the direct or indirect underwriting or any such undertaking, (iv) to effect transactions in any securities of either entity in the Company Group for the account of others, or (v) to guarantee or serve as a guaranty of any security.

**3. Standard of Performance.** The Consultant shall apply its best efforts toward the achievement of the objectives defined in this Agreement with respect to the Project.  The Company Group acknowledges that the Consultant cannot guarantee success with respect to CITIBANK, the Financing Plan or any of elements thereof.

**4. Fee Compensation.** As compensation to the Consultant, The Company Group shall pay the Consultant as follows:

(a) In connection with the Consultant services described herein involving the Project, and for any Transaction ("Transaction") involving The Company Group for which Consultant believes in good faith it will be able to obtain Financing, Consultant shall Package or have Packaged the Transaction and prepare or have prepared a Term Sheet ("Term Sheet") for that Transaction that: (a) sets forth the terms under which Adequate Financing will be provided, and (b) will be agreed to by Consultant and The Company Group by evidence of their execution of said Term Sheet. The Company Group shall pay to Consultant a Compensation Fee as follows:  A flat fee of three (3%) of the aggregate Adequate Financing as approved and closed on by The Company Group.  Said Fee shall be paid only when the Transaction is closed. In the event a line of credit is obtained, the Fee shall be payable when the maximum amount available under such line of credit, whether or not drawn upon, has been made available to The Company Group.

SMITCOMS N.V. Initial _____    TelEm Group Initial _____    The Merit Group Initial _____

3

(b)     The Compensation Fee with respect to any Financing shall be paid in the full amount on the day of the closing of such Financing and will be due and owing only if the Financing is approved by The Company Group and implemented, and that such closing occurs. The Compensation Fee shall be paid from closing proceeds. In the event the terms of any loan prohibit or limit the use of proceeds or otherwise forbids the use of proceeds to Pay Compensation or Consulting Fees, the Compensation Fee shall be paid by The Company Group from general funds.

(c)     The Company Group shall cause the Compensation Fee to be paid directly to the Consultant by wire transfer and shall issue the necessary instructions and authorizations necessary to effectuate said transfer.

(d)     Any amounts owed the Consultant by The Company Group under this Agreement shall automatically bear interest at the rate of five (5%) percent over Prime from the date such amounts become due and payable.

(e)     In the event The Company Group elects to effect a Transaction in securities with respect to the Project for which the Consultant has provided any services or provided any advice with respect to the terms, conditions or requirements of lenders that are incorporated into the terms of any such transaction, then the Consultant shall be entitled to the full amount of its Compensation Fee. The Parties agree that this provision shall be subject to timing and duration provisions set out under this Agreement, including paragraph 5, below.

5.   **Duration.** This Agreement shall terminate on January 1, 2007; provided that, at the end of such term, or at the end of any subsequent renewal term, this Agreement shall be extended for an additional six-month period in the event the parties sign a notice of renewal 30 days before the expiration date of the Agreement; and provided further that, in the event any Potential Lender involved in the CITIBANK Project provides all or any part of the financing for any Project (as a lender, an underwriter, a private placement agent, an insurer, a financial adviser, a line of credit provider, a letter of credit provider, a liquidity provider, a participant in any such financing, or in any similar capacity) at any time within one year of the termination date of the Agreement, the Consultant shall be entitled to payment of the Compensation Fee notwithstanding any termination of this Agreement. For purposes of this Agreement, "Potential Lender" shall mean any lender, insurer, line of credit provider, letter of credit provider, liquidity provider, or person in any similar capacity, or any Affiliate or assign thereof or successor thereto, who has provided a Term Sheet to The Company Group during the term of this Agreement and who is introduced in writing by the Consultant to The Company Group or any representative of any government or agency thereof who is identified by the Consultant to The Company Group as a source of credit enhancement or mortgage insurance, or who is identified by a Potential Lender under the CITIBANK Project as defined herein to The Company Group. Any person identified in writing by Merit as a Potential Lender and who has provided a Term Sheet to The Company Group will be considered as such without additional action. Failure to identify a party in writing shall exclude such party from being considered a Potential Lender. The Parties hereto acknowledge and agree that the following (and all their successors, assigns and Affiliates) is a "Potential Lender" under the Project: CITIBANK GROUP, New York and Trinidad.

SMITCOMS N.V. Initial ____   TelEm Group initial ____   The Merit Group Initial ____

4

**6. Full Control.** The Company Group shall not in any way be obliged to accept any commitment, financial or otherwise, proposed by the Consultant and the Consultant shall not have the authority to accept any commitment or enter into any contract on behalf of The Company except as may be expressly approved in writing by The Company Group.

**7. Independent Contractor Relationship.** Nothing contained in this Agreement shall be construed to constitute the Consultant as the partner or employee of The Company Group. Neither Party has any authority to bind the other in any respect. Each Party is and shall remain an independent contractor, responsible only for its own actions.

**8. Termination.** The Consultant engagement under this Agreement may be terminated by The Company Group at any time by 30 days prior written notice to the Consultant without liability or continuing obligation to the Consultant except for any rights acquired by the Consultant prior to such termination or for compensation, including rights for compensation following termination as provided in Section 5 hereof, and for the provisions relating to indemnity, confidentiality and resolution of disputes and any other rights which provide by the terms hereof that they shall survive any termination as set forth herein.

**9. Entire Agreement.** This Agreement sets out the entire agreement and understanding between the Company Group and the Consultant with respect to the Services to be provided by the Consultant in this Agreement and supersedes and cancels any prior communications, understandings and agreements, both written and oral, between the Parties. This Agreement cannot be amended or otherwise modified except by an instrument in writing signed on behalf of each of the Parties hereto. The provisions hereof shall inure to the benefit of and be binding upon the successors and assigns of The Company Group and the Consultant.

**10. Dispute Resolution.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York, U.S.A. The Parties hereby irrevocably submit to the jurisdiction of the courts of the State of New York in connection with any dispute related to or under this Agreement of the financing. The Parties further agree that the substantially prevailing Party in any litigation shall be entitled to recover fully its attorney fees and costs, including investigative costs, incurred (a) prior to litigation, if related to the litigation or to an effort to investigate and negotiate a solution to the dispute; (b) in litigation, including expenses and costs of appeal; and (c) in post-judgment activity, including the expenses and costs of collection.

**11. Notices.** Any notice required under this Agreement shall be in writing and deemed given and effective upon delivery if sent by personal delivery, express service or via facsimile transmission, or five days after posting if sent by certified United States Mail, return receipt requested, with postage pre-paid and addressed as follows:

The Company Group

Managing Director
SMITCOMS, NV
Falcon Drive, No. 3, Harbour View
Phillipsburg, Sint Maarten, Netherlands Antilles

SMITCOMS N.V. Initial _____    TelEm Group Initial _____    The Merit Group Initial _____

5

The Merit Group

Manager
The Merit Group
575 Lexington Avenue
Suite 400,
New York, NY 10022

**12. No Third Party Beneficiaries.** Nothing in this Agreement and all documentation related hereto is intended to or shall create any third-party beneficiaries, and neither Party shall make any representations to the contrary.

**13. Paragraph Captions and Construction.** The paragraph captions (or headings) in this Agreement are strictly for convenience and shall not be considered in interpreting this Agreement, or as amplifying or limiting any of its content. Words in this Agreement that import the singular connotation shall be interpreted as plural, and words that import the plural connotation shall be interpreted as singular, as the Parties hereto or objects referred to may so require.

**14. Severability and Waiver.** If any of the provisions of this Agreement is or becomes illegal, unenforceable, or invalid (in whole or in part for any reason), the remainder of this Agreement shall remain in full force and effect without being impaired or invalidated in any way. Neither Party's failure to insist upon strict performance of any provision of this Agreement shall be construed as a waiver of any of its rights hereunder.

**15. Non-Assignability.** This Agreement may not be assigned without prior written consent of The Company Group.

**16. Counterparts.** This Agreement may be executed in any number of counterparts, each of which is an original and all of which together evidence the same Agreement.

**17. Joint and Several Liability.** Each entity comprising The Company Group acknowledges that the obligations under this Agreement are the joint and several obligations of such entity and that no release or discharge of a settlement with any of such entity by the Consultant shall in any way release, discharge or otherwise affect or impair the liability of any other entity. The Consultant may proceed to enforce any rights arising hereunder against either or both such entities, and shall not be obligated to join any other entity in any action hereunder or seek contribution from any such entity,

*SMITCOMS N.V. Initial*                *TelEm Group Initial*                *The Merit Group Initial*

6

The Company Group and The Merit Group

[Left Intentionally Blank]

SMITCOMS N.V. Initial _____    TelEm Group Initial _____    The Merit Group Initial _____

7

IN WITNESS WHEREOF, the Parties hereto, and in confirmation of their consent to the terms and conditions contained in this Agreement and intending to be legally bound hereby, have executed this Agreement in their duly authorized respective capacities effective as of the date set forth above.

**The Company Group**

SMITCOMS, NV

By: _____

Name: Curtis K. Haynes

Title: Managing Director


TelEm NV

By: _____

Name: Edward Benjamin

Title: President Director

and


**The Merit Group, LLC**

By: _____

Name: ALFRED SALAZAR

Member General Partner

SMITCOMS N.V. Initial _____   TelEm Group Initial _____   The Merit Group Initial _____

8

**NEW ISSUE**                                                                                    **NOT RATED**

# LIMITED OFFERING MEMORANDUM NO. _____

### $78,000,000
### SINT MAARTEN TELECOMMUNICATIONS HOLDING COMPANY, NV
### FACILITIES REVENUE BONDS
### SERIES 2006

**Dated: Date of Delivery**                                      **Maturity Date: December 15, 2016**

The Sint Maarten Telecommunications Holding Company, NV Facilities Revenue Bonds, Series 2006 (the "Series 2006 Bonds" or the "Bonds") are being issued pursuant to a Trust Deed, dated as of December 15, 2006 (the "Trust Deed"), between Sint Maarten Telecommunications Holding Company, NV (the "Issuer") and the Royal Bank of Trinidad and Tobago (the "Trustee"). Proceeds of the Bonds will be applied (i) to acquire, construct, install and complete certain telecommunication facilities, (ii) to refinance certain indebtedness, (iii) to fund a Debt Service Reserve Fund with respect to the Bonds, (iv) to provide prefunded construction period interest, and (v) to pay certain costs with respect to the issuance and sale of the Bonds.

### MATURITY SCHEDULE

US$16,000,000  9.50% Series 2006A Term Bonds Due December 15, 2016
US$62,000,000  9.35% Series 2006B Term Bonds Due December 15, 2016

The Bonds are to be issued initially in fully registered form in denominations of US$100,000 or any integral multiple of US$5,000 in excess thereof.

The Bonds are payable from certain revenue, after payment of operating and maintenance expense (the "Net Pledged Revenues"), of the telecommunication facilities (the "System") owned by subsidiary enterprises of the Issuer.  The Bonds constitute a first and prior, but not necessarily an exclusive lien, on the Net Pledged Revenues. The Bonds are also secured by (i) a mortgage or security interests in assets of telecommunication companies owned by the Issuer, (ii) a pledge of the shares of those companies, (iii) an assignment of certain licenses, concessions and contracts of the Issuer or related companies, and (iv) the Debt Service Reserve Fund herein described. *See* "SECURITY FOR THE BONDS" herein.

Interest on the bonds is payable on June 15 and December 15 of each year, commencing June 15, 2007. Regularly schedule installments of principal of the Bonds are payable on June 15 and December 15 of each year, commencing December 15, 2008.  Payment of interest and such installments of principal will be made by check or draft mailed to the registered owner of the Bonds or by wire transfer arrangements between the owner of Bond and the Trustee. Principal (other than scheduled installments of principal) and any premium on the Bonds are payable at maturity or prior redemption upon presentation and surrender of the Bonds at the principal corporate trust office of First Citizens Trustee Services Limited (the "Paying Agent"), in Port of Spain, Trinidad, as paying agent, transfer agent and registrar,. *See* "THE BONDS" herein.

The Bonds are subject to mandatory and optional redemption prior to maturity as set forth in "THE BONDS--Prior Redemption."

**THE BONDS SHALL NOT CONSTITUTE A DEBT OR OBLIGATION OF THE GOVERNMENT OF THE ISLAND TERRITORY OF ST. MAARTEN, THE NETHERLANDS ANTILLES, BUT ARE PAYABLE BY THE ISSUER FROM CERTAIN NET PLEDGE REVENUES OF THE TELECOMMUNICATION SYSTEM, AS HEREIN DESCRIBED.**

This cover page contains certain information for quick reference only.  It is not a summary of this issue.  Investors should read this entire Limited Offering Memorandum particularly the section entitled "SPECIAL FACTORS," to obtain information essential to the making of an investment decision.

**Any purchaser of Bonds upon the initial offering by the Issuer is required to execute an investment letter in the form attached hereto.**

The Bonds are offered when, as, and if issued by the Issuer and accepted by the original purchasers, subject to the approving legal opinion of Duncan & Brandon, Attorneys at Law, Phillipsburg, St. Maarten, Netherlands, Antilles, Counsel to the Issuer. It is expected that delivery of the Bonds will be made in Port of Spain, Trinidad, on or about December 15, 2006. Citicorp Merchant Bank Limited has acted as Arranger is connection with the Bonds.

## Arranger: Citicorp Merchant Bank Limited

**The Trinidad and Tobago Securities and Exchange Commission has not in any way evaluated the merits of the securities offered hereunder and any representation to the contrary is an offence.**

**The date of this Limited Offering Memorandum is December 1, 2006**

**COPIES OF THIS LIMITED OFFERING MEMORANDUM HAVE BEEN NUMBERED AND DELIVERED TO A LIMITED NUMBER OF POTENTIAL INVESTORS. THIS DOCUMENT MAY NOT BE COPIED OR DELIVERED TO ANY PERSON OTHER THAN THE INTENDED RECIPIENT, AND IS TO BE RETURNED TO THE ISSUER ON REQUEST.**

**THIS PROSPECTUS HAS BEEN SEEN AND APPROVED BY THE DIRECTORS OF THE ISSUER AND/OR THE OFFEROR AND THEY COLLECTIVELY AND INDIVIDUALLY ACCEPT FULL RESPONSIBILITY FOR THE ACCURACY OF THE INFORMATION GIVEN AND CONFIRM THAT, AFTER HAVING MADE ALL REASONABLE ENQUIRIES, AND TO THE BEST OF THEIR KNOWLEDGE AND BELIEF, THERE ARE NO FALSE OR MISLEADING STATEMENTS OR OTHER FACTS THE OMISSION OF WHICH WOULD MAKE ANY STATEMENT HEREIN FALSE OR MISLEADING.**

### USE OF INFORMATION IN THIS LIMITED OFFERING MEMORANDUM

This Limited Offering Memorandum, which includes the cover page and appendices, does not constitute an offer to sell or the solicitation of an offer to buy any of the Bonds in any jurisdiction in which it is unlawful to make such offer, solicitation, or sale.  No dealer, salesperson, or other person has been authorized to give any information or to make any representations other than those contained in this Limited Offering Memorandum in connection with the offering of the Bonds, and if given or made, such information or representation must not be relied upon as having been authorized by the Issuer.

The information set forth herein has been obtained from the sources referenced throughout this Limited Offering Memorandum and from other sources believed to be reliable. No representation or warranty is made, however, as to the accuracy or completeness of such information, and nothing contained herein is, or shall be relied upon as, a guarantee of the Issuer.  This Limited Offering Memorandum contains, in part, estimates and matters of opinion which are not intended as statements of fact, and no representation is made as to the correctness of such estimates and opinions, or that they will be realized.

The information, estimates, and expressions of opinion contained herein are subject to change without notice, and neither the delivery of this Limited Offering Memorandum nor any sale of the Bonds shall, under any circumstances, create any implication that there has been no change in the affairs of the Issuer, or in the information, estimates or opinions set forth herein, since the date of this Limited Offering Memorandum.

This Limited Offering Memorandum has been prepared only in connection with the original offering and sale of the Bonds and may not be reproduced or used in whole or in part for any other purpose.

THE PRICES AT WHICH THE BONDS ARE OFFERED BY THE ISSUER (AND THE YIELDS RESULTING THEREFROM) MAY VARY FROM THE INITIAL OFFERING PRICES OR YIELDS APPEARING ON THE COVER PAGE HEREOF.  IN ADDITION, THE ISSUER MAY ALLOW CONCESSIONS OR DISCOUNTS FROM SUCH INITIAL OFFERING PRICES OR YIELDS TO DEALERS AND OTHERS.  IN ORDER TO FACILITATE DISTRIBUTION OF THE BONDS, THE ISSUER MAY ENGAGE IN TRANSACTIONS INTENDED TO STABILIZE THE PRICE OF THE BONDS AT A LEVEL ABOVE THAT WHICH MIGHT OTHERWISE PREVAIL. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

# TABLE OF CONTENTS

Page

SUMMARY STATEMENT ...............................S-1

INTRODUCTION AND SUMMARY ..................1
    The Issuer ...............................................1
    Purpose......................................................1
    Authority for Issuance....................................1
    The Bonds .................................................2
    Security ....................................................2
    Prior Redemption ........................................2
    Additional Information ..................................3

SPECIAL FACTORS..........................................3
    Forward Looking Statement............................3
    Limited Obligations ......................................3
    Additional Governmental Approval................4
    Newly-Formed Entity ...................................4
    Financial Statements ....................................4
    Additional Indebtedness.................................5
    Limited Market ...........................................5
    Value of the System Facilities........................5
    Secondary Market ........................................5
    Legal Matters and Bond Owners' Remedies
     Upon Default............................................5
    System Revenues .........................................5
    Competition.................................................6
    Risks Related to Remedies.............................7
    Contractor Performance ................................7
    Future Changes in Law .................................7

THE BONDS ....................................................8
    General......................................................8
    Prior Redemption ........................................8
    Additional Bonds.......................................10
    Debt Service Requirements...........................10

SOURCE AND USE OF PROCEEDS ...............11

THE PROJECT ................................................11

SECURITY FOR THE BONDS .........................11
    General.....................................................11
    Deposit Account.........................................12
    Debt Service Reserve Fund...........................12
    Additional Security .....................................12
    Financial Covenants....................................12

ST. MAARTEN ..............................................13
    Government Structure.................................14
    Kingdom of the Netherlands ........................14
    The Federal Level .......................................15
    Island Level ..............................................16
    Constitutional Status ...................................16

THE ISSUER ..................................................17
    General.....................................................17
    Management...............................................18
    Employees.................................................20
    Revenues and Expenditures ..........................20

STATEMENT OF INCOME FOR THE PERIOD
2001-2005 .....................................................21
    Management Projections...............................21
    Management Discussion and Analysis................21

THE SYSTEM .................................................23
    Basic Telecommunications Infrastructure
     in the Caribbean .....................................23
    Basic Telecommunications Infrastructure
     in St. Maarten.......................................24
    SMITCOMS................................................24
    TelEm.......................................................31
    TelCell .....................................................31

LEGAL OPINION ...........................................32
    Opinion of Counsel ....................................32

LITIGATION...................................................32

LIMITED OFFERING......................................32

RATINGS .......................................................33

MISCELLANEOUS .....................................33

APPENDIX A-FORMS OF DOCUMENTS............A-1
APPENDIX B- FINANCIAL STATEMENTS.........B-1

# SUMMARY STATEMENT

*The following Summary Statement is subject in all respects to more complete information contained in this Limited Offering Memorandum and in the Appendices to this Limited Offering Memorandum. The offering of Bonds to potential investors is made only by means of this entire Limited Offering Memorandum, including the Appendices, and no person is authorized to detach this Summary Statement from this Limited Offering Memorandum or to otherwise use it without the entire Limited Offering Memorandum, including the Appendices. FOR THE DEFINITION OF CERTAIN TERMS USED IN THIS SUMMARY STATEMENT, SEE "FORMS OF DOCUMENTS—The Trust Deed" IN APPENDIX A HERETO. Citicorp Merchant Bank Limited has acted as Arranger is connection with the Bonds*

| | |
|---|---|
| The Bonds: | The offering consists of $16,000,000 principal amount of Sint Maarten Telecommunications Holding Company, NV Facilities Revenue Bonds, Series 2006A (the "Series 2006A Bonds") and $62,000,000 principal amount of Sint Maarten Telecommunications Holding Company, NV Facilities Revenue Bonds, Series 2006B (the "Series 2006B Bonds" and together with the Series 2006A Bonds, the "Series 2006 Bonds" or the "Bonds"). *See* "THE BONDS" herein. The Bonds will be issued and secured pursuant to a Trust Deed, dated as of December 15, 2006 (the "Trust Deed"), between the Sint Maarten Telecommunications Holding Company, NV (the "Issuer") and Royal Bank of Trinidad and Tobago (the "Trustee"). |
| Interest: | Interest on the Bonds is payable on June 1 and December 1, with interest first payable on June 1, 2007, by check or draft mailed to the holders of the Bonds by First Citizens Trustee Services Limited, as paying agent, transfer agent, and registrar (the "Paying Agent"). *See* the Cover Page for interest rates and maturities. |
| Principal: | Principal of the Bonds is payable pursuant to mandatory sinking fund redemption on June 1 and December 1, in the years and amounts set forth herein. *See* "THE BONDS-- Mandatory Sinking Fund Redemption" herein |
| Prior Redemption: | In addition to sinking fund redemption, the Bonds are subject to extraordinary mandatory redemption following an Event of Default. Also, the Series 2006A Bonds are subject to optional redemption on the dates and for the prices set forth herein. *See* "THE BONDS - Redemption of the Bonds" herein. |
| Use of Proceeds: | Proceeds of the Bonds will be applied (i) to acquire, construct, install and complete certain telecommunication facilities (the "Property"), (ii) to refinance certain indebtedness, (iii) to fund a Debt Service Reserve Fund with respect to the Bonds, (iv) to provide prefunded construction period interest, and (v) to pay certain costs with respect to the issuance and sale of the Bonds. *See* "SOURCE AND USE OF PROCEEDS" and "THE PROJECT" herein. |
| The Issuer: | Sint Maarten Telecommunications Holding Company, NV is a limited liability company organized under the laws of the Netherlands Antilles on November 6, 2006, in connection with the consolidation of certain telecommunications companies owned by the Island Government of Sint Maarten, Netherlands Antilles (the "Government"). All of the outstanding shares of the Issuer are owned by the Government. *See* "THE ISSUER" herein. |

Security:

The Bonds are payable out of and secured by an irrevocable assignment and pledge of certain Net Pledged Revenues derived and to be derived from the telecommunications facilities owned by Subsidiary Companies of the Issuer (the "System"), after payment of the necessary and reasonable costs and expenses of the operation and maintenance of the System. *See* "SECURITY FOR THE BONDS" herein.

All operating revenues of the System will, immediately upon their receipt or collection, be deposited to a Deposit Account.

In addition, the Issuer shall maintain in a Debt Service Reserve Fund held by the Trustee as a minimum an amount equal to the Debt Service Reserve Fund Requirement. The moneys in the Debt Service Reserve Fund shall be maintained as a continuing reserve to be used, except as otherwise herein provided, only to prevent deficiencies in payment of the principal of and interest on the Bonds resulting from failure to deposit into the Bond Fund sufficient funds to pay such principal and interest as the same accrue. Any amounts on deposit in the Debt Service Reserve Fund on the maturity date of the Bonds will be applied to the payment thereof.

In order to secure the obligations of the Issuer under the Trust Deed, each Subsidiary Company shall execute a Deed of Assignment instrument (a "Mortgage"), pledging to the Trustee its interest in Gross Revenues, and providing a mortgage or chattel mortgage interest to the Trustee in its interest in System facilities. Each Subsidiary Company will also assign their respective interests in certain contracts to the Trustee as security for the Bonds. In addition, the Issuer will pledge its interests in the outstanding shares of the Subsidiary Companies to the Trustee.

THE GOVERNMENT IS NOT OBLIGATED TO PAY THE PRINCIPAL OF OR INTEREST ON THE BONDS.

Investment Risks:

Payment of the principal of, premium, if any, and interest on the Bonds will be dependent on revenues to be derived from the System. Certain risks are inherent in the production of such revenues. *See* "SPECIAL FACTORS" for a discussion of these risks.

# LIMITED OFFERING MEMORANDUM

# $78,000,000

# SINT MAARTEN TELECOMMUNICATIONS HOLDING COMPANY, NV
# FACILITIES REVENUE BONDS
# SERIES 2006

## INTRODUCTION AND SUMMARY

This Limited Offering Memorandum, which includes its cover page and appendices, is furnished to prospective purchasers of $16,000,000[*] principal amount of Sint Maarten Telecommunications Holding Company, NV Facilities Revenue Bonds, Series 2006A (the "Series 2006A Bonds") and $62,000,000[*] principal amount of Sint Maarten Telecommunications Holding Company, NV Facilities Revenue Bonds, Series 2006B (the "Series 2006B Bonds" and together with the Series 2006 A Bonds, the "Series 2006 Bonds" or the "Bonds"). The Bonds are issued and secured pursuant to a Trust Deed, dated as of December 15, 2006 (the "Trust Deed"), between Sint Maarten Telecommunications Holding Company, NV (the "Issuer") and Royal Bank of Trinidad and Tobago (the "Trustee"). The offering of Bonds is made only by way of this Limited Offering Memorandum, which supersedes any other information or materials used in connection with the offer or sale of the Bonds. Accordingly, prospective purchasers should read this entire Limited Offering Memorandum before making an investment decision. Additional information concerning the Issuer, the Bonds and other aspects of this offering may be obtained from the Issuer at the address set forth in the section entitled "-- Additional Information." Capitalized terms used but not otherwise defined in this Limited Offering Memorandum shall have the respective meanings set forth in the Trust Deed. *See* "APPENDIX A– Form of Documents -The Trust Deed."

The following material is qualified in its entirety by the more complete information contained throughout this Limited Offering Memorandum, and detachment or other use of this "INTRODUCTION AND SUMMARY" without the entire Limited Offering Memorandum, including the cover page and the appendices, is unauthorized.

**The Issuer**

Sint Maarten Telecommunications Holding Company, NV is a limited liability company organized under the laws of the Netherlands Antilles on November 6, 2006, in connection with the reorganization of government-owned telecommunications companies located in Sint Maarten in the Netherland Antilles. *See* "THE ISSUER." All of the outstanding shares of the Issuer are owned by the Government of the Island Territory of Sint Maarten, the Netherlands Antilles (the "Government"). The Issuer, in turn, is the owner of all the outstanding shares of (i) Sint Maarten International Telecommunications, NV ("SMITCOMS"), (ii) St. Maarten Telephone Company, N.V ("TelEm"), (iii) TelCell, NV ("TelCell"), and (iv) St. Maarten Telecom Operating Company, NV (the "Operating Company," and together with SMITCOMS, TelCell and TelEm, the "Subsidiary Companies").

**Purpose**

Proceeds of the Bonds will be applied (i) to acquire, construct, install and complete certain telecommunication facilities (the "Property"), (ii) to refinance certain indebtedness, (iii) to fund a Debt Service Reserve Fund with respect to the Bonds, (iv) to provide prefunded construction period interest, and (v) to pay certain costs with respect to the issuance and sale of the Bonds. *See* "SOURCE AND USE OF PROCEEDS" and "THE PROJECT" herein.

**Authority for Issuance**

The Bonds are being issued pursuant to a resolution adopted by the Board of Supervisors of the Issuer (the "Board"), and pursuant to the Trust Deed.

**The Bonds**

The Bonds are issued as fully registered bonds, without coupons, in the denomination of $100,000 or any integral multiple of $5,000 in excess thereof. The Bonds bear interest at the rates, and mature in the amounts and on the dates, as set forth on the cover page of this Limited Offering Memorandum. Interest on the Bonds is payable semiannually on June 15 and December 15 of each year, by the First Citizens Trustee Services Limited, (the "Paying Agent"), as paying agent, transfer agent and registrar, with the first interest payment due June 15, 2007. Regularly schedule installments of principal of the Bonds are payable on June 15 and December 15 of each year, commencing December 15, 2008. Payment of interest and such installments of principal will be made by check or draft of the Paying Agent, mailed to the registered owner of the Bonds or by wire transfer arrangements between the owner of Bond and the Paying Agent. Principal (other than scheduled installments of principal) and any premium on the Bonds are payable at maturity or prior redemption upon presentation and surrender at the principal corporate trust office of the Paying Agent in Port of Spain, Trinidad. *See* "THE BONDS."

**Security**

The Bonds are payable out of and secured by an irrevocable assignment and pledge (but not necessarily an exclusive assignment and pledge) of certain Net Pledged Revenues derived and to be derived from the operating income and revenues of the telecommunication facilities owned by SMITCOM, TelEm, and TelCell, (the "System") after payment of the necessary and reasonable costs and expenses of the operation and maintenance of the System, as more specifically provided in a the Trust Deed. Pursuant to operating agreements between the Operating Company and each of SMITCOMS, TelEm, and TelCell, the operation of the System and collection of all System revenues are the responsibility of the Operating Company. All operating revenues of the System will, immediately upon receipt or collection, be deposited in a special blocked account of the Operating Company (the "Deposit Account"), to be held by Windward Islands Bank (the "Deposit Bank"). **THE BONDS DO NOT CONSTITUTE AN OBLIGATION OF THE GOVERNMENT.** *See* "APPENDIX A– Form of Documents-The Trust Deed."

The Bonds are also payable from certain net proceeds of insurance policies or condemnation awards, from interest earnings on moneys in certain funds and accounts or from net proceeds from the leasing or a liquidation of the Trustee's interest in the System facilities. The Bonds will be secured by a pledge by the Issuer of all shares of the Subsidiary Companies. Also, the Bonds will also be secured by (i) a mortgage interest in and pledge of System facilities, (ii) an assignment of licenses, concessions and contracts, and (iii) and a pledge of all rights to Gross Revenues, executed by the respective Subsidiary Companies.

In addition, proceeds of the Bonds in the amount of $7,317,000 will be deposited in a Debt Service Reserve Fund created pursuant to the Trust Deed, to be applied to the payment of principal of or interest on the Bonds on any payment date therefor in the event amounts otherwise on deposit with the Trustee are not sufficient for such purpose.

For further description of the security of the Bonds, see generally "SECURITY FOR THE BONDS," and "APPENDIX A - Form of Documents-The Trust Deed."

**Prior Redemption**

The Bonds are subject to optional and mandatory redemption prior to maturity (including mandatory sinking fund redemption) as set forth herein under "THE BONDS - Prior Redemption."

**Additional Information**

Additional information concerning the Issuer and the Bonds may be obtained from the Issuer at the following address:

> Falcon Drive No. 3
> Harbor View
> Sint Maarten
> Netherlands Antilles

2

**Investment Considerations**

Before making an investment decision prospective investors should read this entire Limited Offering Memorandum and should consider carefully all of the information contained herein.

**SPECIAL FACTORS**

***The purchase of the Bonds involves certain investment risks which are discussed throughout this Limited Offering Memorandum, and each prospective investor should make an independent evaluation of all information presented in this Limited Offering Memorandum in order to make an informed investment decision. The following discussion is not intended to be a comprehensive presentation of all risks associated with investment in the Bonds, some of which risks are discussed throughout this Limited Offering Memorandum. In making any investment decision concerning the Bonds, prospective investors in the Bonds must rely on their own examination of the Bonds, the security thereof and the merits and risks of investment therein. The contents of this Limited Offering Memorandum should not be construed as legal, business, or tax advice, and each prospective investor should consult its own attorney, business advisor and tax consultant before making any investment decisions concerning the Bonds.***

**Forward Looking Statements**

This Limited Offering Memorandum, and particularly the information contained under the headings entitled "INTRODUCTION AND SUMMARY" and "SPECIAL FACTORS," contains statements relating to future results. When used in this Limited Offering Memorandum, the words "anticipate", "estimate," "forecast," "intend," "expect," "projected" and similar expressions identify forward-looking statements. Such statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated in such forward-looking statements. Any projection is subject to such uncertainties. Inevitably, some assumptions used to develop the projections may not be realized and unanticipated events and circumstances may occur. Therefore, it can be expected that there will be differences between projections and actual results, and those differences may be material.

**Limited Obligations**

The Bonds are payable from and secured by the Net Pledged Revenues obtained by the Issuer from the operation of the System, and a lien on the System facilities. The security for the punctual payment of the principal of and interest on the Bonds is dependent on the receipt of revenues in an amount sufficient to meet the debt service requirements of the Bonds and the operating expenses of the System. Receipt of such revenues may depend, in part, on the ability of the Operating Company to collect revenues, to implement and collect rate increases sufficient to satisfy the requirements of the Trust Deed, and to operate the System in an efficient manner.

Upon the termination of the Trust Deed following the occurrence of an Event of Default, the Trustee may foreclose on and sell the System facilities, and the Net Proceeds thereof, together with any other moneys then held by the Trustee, are required to be used to redeem the Bonds to the extent of such moneys. Bond owners should not assume that it will be possible to liquidate the System facilities after a termination of the Trust Deed by reason of the occurrence of an Event of Default for an amount equal to the aggregate principal amount of the Bonds then outstanding plus accrued interest thereon.

The Issuer covenants in the Trust Deed to maintain property damage insurance in the amount of $50,000,000 with respect to equipment and buildings, and $30,000,000 of insurance with respect to business interruption or costs of reconstruction of data, with a deductible of $250,000 for any one occurrence. In addition, the Issuer agrees to maintain damage and personal injury insurance in an amount not less than $1,135,000.. There is no assurance such amount will be adequate to repair and replace lost, damaged or destroyed property constituting part of the System, or that insurance will be available at commercially-reasonable rates, or that moneys made available by reason of any such occurrence will be sufficient to redeem the Bonds or replace such property.

It should be noticed that the Bonds are not payable on a schedule of substantially equal semiannual payments. Payment of the final installment of principal of the Bonds assumes the availability of the Debt Service Reserve Fund and a refinancing of the unpaid principal amount of the Bonds. If the Issuer is unable to obtain such refinancing at

commercially acceptable rates of interest, it is unlikely that the revenues of the System will be adequate for such final installment.

**Additional Governmental Approval**

In addition, the ability to operate the System is dependent on various license agreements, concessions and other permits from the Government, from the island governments of certain customers of the System, or from the United States government. Such license agreements, concessions and other permits have limitations on transferability, and there can be no assurance that the Trustee or any other successor in interest will be able to provide for the transfer of such license agreements, concessions and other permits necessary to effectively operate the System or any portion thereof until consent thereto is provided by the governmental agency issuing such license, concession or permit. In fact, operation of any System facility effected through a foreclosure of pledged shares of a Subsidiary Company owning any license could be subject to challenge if such transfer was not approved by such governmental agency. With respect to the U.S. Federal Communications Commission license held by SMITCOMS, Inc., the Issuer anticipates a notice filing will be prepared following the issuance of the Bonds concerning the transfer of the shares of SMITCOMS NV, presently held by the Government, to the Holding Company (all of whose shares, in turn, will be held by the Government), and that additional approval will not be required.

Construction and completion of certain improvements, such as the completion of additional submarine cable landing sites, are anticipated to require additional governmental approvals, including satisfaction of environmental impact requirements. SMITCOMS has, in the past, satisfied with requirements such as those imposed by the United States Environmental Protection Agency in connection with the completion of submarine cable landing site facilities on the Island of Puerto Rico.

**Newly-Formed Entity**

Prior to the reorganization of the government-owned telecommunication companies located on the Island of Sint Maarten, System facilities have been operated by the respective Subsidiary Companies. *See* "THE SYSTEM" herein. Following the reorganization, operation of all System Facilities will be the responsibility of the Operating Company. The Operating Company and the Issuer are newly-formed entities, and a primary purpose of the reorganization is to effect certain savings with respect to efficiency of management and operation. However, there can be no assurances that such savings will be realized, or that savings will be adequate to ensure that full and timely payment of the principal, premium, if any, and interest, with respect to the Bonds will be made.

As a result of the consolidation, there is likely to be a reduction in the number of employees from the pre-consolidation levels. There can be no assurance that the management and staff of the Subsidiary Companies who will undertake management responsibilities at the Operating Company will be able to integrate the skills and experience of such personnel into an effective operations of a provider of multiple telecommunications activities, without regard to the risks associated with the operation of any telecommunications provider, and without regard to the risks associated with any newly formed operating entities.

Reference is made the audited financial statements of TelEm, in which the independent auditor concluded that it had not been able to perform sufficient procedures to obtain reasonable assurances on the completeness or accuracy of the revenues of TelEm, the accounts receivable, the accounts payable, inventories, fixed assets, investments n subsidiaries and related items, and that, as a result, the auditor was unable to express an opinion about whether the financial statements, taken as a whole, give a true and fair view. That opinion was based, in part, on the fact that TelEm continued to experience weakness in internal control in certain areas. While the Issuer anticipates that the consolidation of the Subsidiary Companies will improve such internal control matters, there can be no assurance that the issues described within the audit will not continue to apply to the activities of the Operating Company.

**Financial Statements**

As a newly-formed company, the Issuer does not yet have audited financial statements. Attached hereto are audited financial statements for TelEm, TelCell, TelNet and SMITCOMS for the year ended December 31, 2005, each of which has been prepared prior to the consolidation.

4

**Additional Indebtedness**

The Issuer may incur Additional Indebted secured by a pledge of the Net Pledged Revenues on a parity with the pledge provided in the Trust Deed, upon satisfaction of the requirements of the Trust Deed. *See* "APPENDIX A– Form of Documents-The Trust Deed—Additional Bonds" herein

**Limited Market**

The offering of the Bonds is being made to a limited number of knowledgeable and experienced investors. Each investor in the initial offering of the Bond will be required to execute an investment letter.

**Value of the System Facilities**

No independent investigation has been or will be made of the value which could be realized upon the foreclosure and sale of the System facilities. Prospective Bond holders should consider the nature of the System facilities and should anticipate that it may not be possible to foreclose on and sell the System facilities upon the occurrence of an Event of Default for an amount equal to the aggregate principal amount of the Bonds then outstanding plus accrued interest thereon. NO REPRESENTATIONS ARE MADE HEREIN REGARDING THE VALUE WHICH COULD BE REALIZED UPON THE FORECLOSURE AND SALE OF THE SYSTEM FACILITIES.

**Secondary Market**

No assurance concerning the future existence of any secondary market can be given. Prospective purchasers of the Bonds should therefore be prepared, if necessary, to hold their Bonds to maturity.

**Legal Matters and Bond Owners' Remedies Upon Default**

The enforceability of the rights and remedies of Bond owners may be subject to limitations imposed by applicable insolvency, reorganization, moratorium or similar laws relating to or affecting the enforcement of creditors' rights generally, now or hereafter in effect; to usual equity principles which may limit the specific enforcement under Dutch or local law of certain remedies; to the exercise by the Government of the powers delegated to it by the federal government; and to the reasonable and necessary exercise, in certain exceptional situations, of the police power inherent in the sovereignty of the Government and its governmental bodies in the interest of serving an important public purpose. Insolvency proceedings or the exercise of powers by the Government, if initiated, could subject the owners of the Bonds to judicial discretion and interpretation of their rights, and consequently may entail risks of delay, limitation or modification of their rights.

**System Revenues**

The Issuer intends to provide for the payment of the Bonds from user fees collected with respect to the System. Satisfaction of the obligations of the Issuer under the Trust Deed will depend on its ability to impose and collect rates, fees and charges for use of the System in an amount sufficient to pay operating costs and debt service requirements, and to operate the System in an efficient manner.

The Issuer anticipates being able to generate additional revenue from improvements to be financed with proceeds of the Bonds. However, there can be no assurance that new and existing facilities will generate such additional revenues, or that the revenues will be adequate to ensure that full and timely payment of the principal, premium, if any, and interest with respect to the Bonds will be made.

Pursuant to the Trust Deed, the Issuer has agreed to impose certain rates, tolls fees and charges for the use of the System. *See* "SECURITY FOR THE BONDS—Rate Maintenance Covenant" herein. However, a substantial portion of System revenues is anticipated to be derived from contractual agreements which may not be subject to additional adjustment. In addition, the ability to impose additional increases on customers of, for example, cellular phone or land-line phone systems, may be subject to practical considerations, such as the affect such increases may have on commercial competitiveness, imposition of increases may not receive approval from regulatory agencies, including the Government..

It should be noted that the Government has, in the past, determined that, as the sole shareholder of a Subsidiary Company, it would be permissible for the Government to withhold payment of fees charged to the Government for telecommunications service. For such reason, financial covenants included within the Trust Deed as to accounts payable and accounts receivable have excluded amounts payable by or to the Government. *See* "SECURITY FOR THE BONDS—Financial Covenants" herein. While the Government has, in recent billing cycles, been remitting invoiced amounts or permitting offsets against amounts payable by Subsidiary Companies to the Government, there can be no assurance that such practice may again be adopted by the Government.

Included in this Limited Offering Memorandum are certain projections of revenues and expenses of the Issuer. *See* "THE ISSUER—Revenues and Expenditures" herein. There are multiple assumptions used by the Issuer in projecting System revenues and expenses. For example, the Issuer assumes (i) there will be a decreasing usage of land-line technology for phone service as cellular telephone and Voice over Internet Protocol ("VoIP") services are available at competitive rates, (ii) with the decline of land-line based technology, there will be increased revenue opportunities in cellular and cable capacity,  and (iii) there are anticipated to be additional opportunities in high-bandwidth applications such as streaming audio, downloading video and streaming video.  None of these assumptions has been independently reviewed or verified. Actual results realized by the Issuer will vary from any projections, and such variance may be material.

**Competition**

There are other licensed telecommunications service providers, in addition to the Subsidiary Companies, operating on the island of St. Maarten providing international telecommunications services and cellular services. Competition in the international telecommunication industry includes UTS/Antelecom N.V, Centennial Netherlands Antilles, NV (which does not have the requisite business license on St. Maarten), East Caribbean Cellular N.V ("ECC") and Cellular One NV (which has requisites licenses but is not yet operational). Radcomm N.V. and ECC are competitors in the cellular phone service market.  There is also the possibility that concessions could be provided for additional service providers. Each such additional provider could be anticipated to adversely affect the income of the Subsidiary Companies and the Net Pledged Revenues. Those companies or investors in those companies may also have long established experience in the telecommunications industry, and have proven product and service lines. In addition, such companies or investors may have greater resources to devote to research and development and marketing, and may have greater access to financial markets, particularly if additional funding requirements are necessary or desirable.  *See also* "THE SYSTEM—SMITCOMS—Competition" herein.

It should be noted that licensed common carriers, as part of the condition to issuance of a license or concession, are often required to provide telecommunication connections and capacity to competitors, but are generally entitled to recover the costs of those connections and services from those competitors. However, in St. Maarten, there are no government procedures for the establishment of rates for such connection costs, or the capacity at which those rates are applied. Disputes have therefore arisen concerning the standards for cost recovery, and, as such, the amounts owed to the Subsidiary Companies from entities which may be competitors, and the amounts owed by the Subsidiary Companies to such entities, remain unclear in several instances, and are the subject of certain litigation. *See* "LITIGATION" herein. For such reason, financial covenants included within the Trust Deed as to accounts payable and accounts receivable have excluded those carriers. *See* "SECURITY FOR THE BONDS—Financial Covenants" herein. Also, because those amounts are not agreed upon, the auditors providing financial statements of TelEm are unable to confirm the amounts of the accounts payable and accounts receivable with respect to those carriers and have been unable to express an opinion as to whether the financial statements, taken as a whole, give a true and fair view. *See* "APPENDIX B—Financial Statements."  The Issuer and the Subsidiary Companies have indicated that they are confident such disputes will ultimately be settled in a manner that does not materially adversely affect available Net Pledged Revenues, but there can be no assurance that settlement will occur in a timely manner, or that other disputes will not arise in the future.

It should also be noted that any future competitors will be obligated to acquire a telecommunication concession from the Federal Government of the Netherlands Antilles, as well as a local business license from the Government of Sint Maarten.

6

**Risks Related to Remedies**

*Insolvency of the Issuer*. In the event of insolvency of the Issuer, legal proceedings and equity principles may delay or otherwise adversely affect the enforcement of Bondholders' rights in the funds and property pledged as security for the Bonds.

*Disposition of Facilities*. The Issuer makes no representation as to the value of the System facilities for the purposes of any disposition. No assurance can therefore be given that the amount realized upon any forced sale of the System facilities would be sufficient to pay and discharge the Bonds.

*Limitations on Remedies*. The practical realization of value from the System facilities upon any default will depend upon the exercise of various remedies specified by the Trust Deed and the Mortgages. These and other remedies may in many respects require judicial actions which are often subject to discretion and delay. The remedies specified in the Trust Deed, the Mortgages or other documents executed in connection therewith may not be readily available or may be limited. A court may decide, for example, not to order the specific performance of the covenants contained in those documents. The various legal opinions delivered with the Trust Deed are qualified as to the enforceability of the various legal instruments by limitations imposed by territorial and federal laws, rulings and decisions affecting remedies and by reorganization or other laws or equitable principles affecting the enforcement of creditors' rights generally.

As a practical matter, the ability to generate adequate Net Pledged Revenues is dependant upon factors which can not be readily addressed by any acceleration of debt. As a result, the Trustee may have to rely on an action for specific performance or a similar action, which could be time consuming and expensive and may require that various remedies be pursued on more than one occasion.

*Redemption*. The Bonds are subject to redemption upon the occurrence of certain events as herein described. *See* "THE BONDS—Redemption" herein.

**Contractor Performance**

Compliance by the Issuer with the obligation under the Trust Deed is not conditioned on performance by manufacturers or other providers of System facilities. However, delays in the performance by such contractors could have an adverse effect on anticipated increases in user revenues, and anticipated decreases in operating expenses related to new equipment. None of the Issuer, the Subsidiary Companies or counsel for any such parties is able to make any representations concerning the ability of such vendors to perform in accordance with any contracts with respect to System facilities.

**Future Changes in Laws**

There can be no assurance that there will not be changes in interpretation of or additions to the applicable laws and provisions which would have a materially adverse effect, directly or indirectly, on the affairs of the Issuer.

## THE BONDS

**General**

The Bonds are issued as fully registered bonds, without coupons, in the denomination of $100,000 or any integral multiple of $5,000 in excess thereof. The Bonds bear interest at the rates, and mature in the amounts and on the dates, as set forth on the cover page of this Limited Offering Memorandum. Interest on the Bonds is payable semiannually on June 15 and December 15 of each year, with the first interest payment due June 15, 2007. Regularly schedule installments of principal of the Bonds are payable on June 15 and December 15 of each year, commencing December 15, 2008. Payment of interest and such installments of principal will be made by check or draft of the Paying Agent mailed to the registered owner of the Bonds or by wire transfer arrangements between the owner of Bond and the Paying Agent. Principal (other than scheduled installments of principal) and any premium on the Bonds are payable at maturity or prior redemption upon presentation and surrender at the principal corporate trust office of the Paying Agent in Port of Spain, Trinidad.

For a complete statement of the details and conditions of this Bond issue, prospective Bond purchasers should refer to the Trust Deed, copies of which are available from the Issuer upon written request prior to delivery of the Bonds. Also see "APPENDIX A."

**Prior Redemption**

*Optional Redemption.*  The Series 2006B Bonds **shall not** be subject to optional redemption prior to maturity. The Series 2006A Bonds shall be subject to redemption prior to maturity, in whole or in part, at the option of the Issuer ("Optional Redemption") at any time, at the redemption price set forth below (expressed as a percentage of the principal amount so redeemed), plus accrued interest to the redemption date.

| Redemption Period (both dates inclusive) | Redemption Price |
|---|---|
| Issue Date through December 14, 2008 | 101.5 % |
| December 15, 2008  and thereafter | 101.0% |

*Mandatory Sinking Fund Prepayment.*  The Series 2006A Bonds are subject to mandatory sinking fund redemption in part by lot, on June 15, 2012, and on each June 15 and December 15 thereafter until and including December 15, 2016, pursuant to the provisions of the Trust Deed, at 100% of the principal amount thereof, plus accrued interest to the redemption date, from mandatory sinking fund payments which are required to be made as set forth below:

| Payment Date | Principal Amount |
|---|---|
| June 15, 2012 | $625,000 |
| December 15, 2012 | 655,000 |
| June 15, 2013 | 690,000 |
| December 15, 2013 | 720,000 |
| June 15, 2014 | 755,000 |
| December 15, 2014 | 790,000 |
| June 15, 2015 | 830,000 |
| December 15, 2014 | 870,000 |
| June 15, 2016 | 910,000 |
| December 15, 2016 | 9,155,000 |

8

The Series 2006B Bonds are subject to mandatory sinking fund redemption in part by lot, on December 15, 2008, and on each June 15 and December 15 thereafter until and including December 15, 2016, pursuant to the provisions of the Trust Deed, at 100% of the principal amount thereof, plus accrued interest to the redemption date, from mandatory sinking fund payments which are required to be made as set forth below:

| Payment Date | Principal Amount | Payment Date | Principal Amount |
|---|---|---|---|
| December 15, 2008 | $1,200,000 | December 15, 2012 | $1,735,000 |
| June 15, 2009 | 1,260,000 | June 15, 2013 | 1,815,000 |
| December 15, 2009 | 1,315,000 | December 15, 2013 | 1,900,000 |
| June 15, 2010 | 1,380,000 | June 15, 2014 | 1,990,000 |
| December 15, 2010 | 1,445,000 | December 15, 2014 | 2,080,000 |
| June 15, 2011 | 1,510,000 | June 15, 2015 | 2,180,000 |
| December 15, 2011 | 1,580,000 | December 15, 2015 | 2,280,000 |
| June 15, 2012 | 1,655,000 | June 15, 2016 | 2,385,000 |
| | | December 15, 2016 | 34,290,000 |

Thirty days prior to a sinking fund payment date for the Bonds, the Paying Agent shall proceed to select for redemption (by lot in such manner as the Paying Agent may determine) from all Bonds of each series and maturity Outstanding which are subject to sinking fund redemption on such date a principal amount of such Bonds equal to the aggregate principal amount of Bonds redeemable with the required sinking fund payment, and shall call such Bonds of such series and maturity for redemption from the particular sinking fund on the next December 15 or June 15, as appropriate, and give notice of such call.

At the option of the Issuer, to be exercised by delivery of a written certificate to the Paying Agent not less than 45 days next preceding any sinking fund redemption date, it may (i) deliver to the Paying Agent for cancellation Bonds which are subject to sinking fund redemption on such date in an aggregate principal amount designated by the Issuer, or (ii) specify a principal amount of such Bonds of each series and maturity which prior to said date have been redeemed (otherwise than through the operation of such sinking fund) and canceled by the Paying Agent and not theretofore applied as a credit against any sinking fund redemption obligation for such Bonds. Each Bond so delivered or previously redeemed shall be credited by the Paying Agent at 100% of the principal amount thereof against the obligation of Issuer on such sinking fund redemption date, and any excess shall be so credited against future sinking fund redemption obligations for Bonds proportionately to all remaining sinking fund payments. In the event the Issuer shall avail itself of the provisions of clause (i) of the first sentence of this paragraph the certificate required by the first sentence of this paragraph shall be accompanied by the Bonds to be canceled.

Notwithstanding any provision of the Trust Deed to the contrary, no additional notice shall be required with respect to mandatory sinking fund redemption unless requested by the holders of 100% of the principal amount of the Bonds, and Bonds need not be presented for mandatory sinking fund redemption payment.

*Extraordinary Mandatory Redemption.* The Bonds also shall be called for redemption at a price of 100% of the principal amount thereof, plus accrued interest to the redemption date, in whole in the event that the Trust Deed is terminated by reason of the occurrence of an Event of Default thereunder.

*Notice of Redemption.* Notice of every redemption of the Bonds (other than regularly scheduled semiannual installments of principal) shall be given by the Paying Agent by sending a copy of such notice by registered, certified, or first-class, postage prepaid mail, not more than 60 days nor less than 30 days prior to the redemption date to each registered owner of any Bond, at his or her address as it last appears on the registration books kept by the Paying Agent. Failure to give such notice by mailing to the registered owner of any Bond, or any defect therein, shall not affect the validity of the proceedings for the redemption of any Bonds. All Bonds will cease to bear interest after the specified redemption date. Such notice shall identify the Bonds or the portions thereof to be redeemed (if less than all are to be redeemed) and the date fixed for redemption, and shall further state that on such redemption date the principal amount thereof and the designated premium thereon, if any, will become due and payable at the Paying Agent, and that from and

9

after such date, interest will cease to accrue. Accrued interest to the redemption date will be paid by check mailed to the registered owner (or by alternative means if so agreed to by the Paying Agent and the registered owner). Notice having been given in the manner provided, the Bond or the Bonds so called for redemption shall become due and payable on the redemption date so designated; and upon presentation thereof at the Paying Agent, the Paying Agent will pay the Bond or the Bonds so called for redemption. Prior to the date fixed for redemption, funds sufficient to pay the Bonds or the portions of the Bonds so called for redemption, together with the premium, if any, and the accrued interest to the redemption date, are to be deposited with the Paying Agent. After the date fixed for such redemption, the giving of notice and the deposit of funds for redemption shall cause the discontinuation of accrual of interest on the Bonds so called for redemption.

**Additional Bonds**

The Trust Deed permits the issuance of Additional Bonds in certain circumstances. *See* "APPENDIX A-- Form of Documents-The Trust Deed --Additional Bonds."

**Debt Service Requirements**

Set forth in the following table is the debt service schedule for the Bonds.

| Payment Date | Principal | Interest | Total Semi- Annual Payments |
|---|---|---|---|
| June 15, 2007 | | $3,658,500 | $3,658,500 |
| December 15, 2007 | | 3,658,500 | 3,658,500 |
| June 15, 2008 | | 3,658,500 | 3,658,500 |
| December 15, 2008 | $1,200,000 | 3,658,500 | 4,858,500 |
| June 15, 2009 | 1,260,000 | 3,602,400 | 4,862,400 |
| December 15,2009 | 1,315,000 | 3,543,495 | 4,858,495 |
| June 15, 2010 | 1,380,000 | 3,482,019 | 4,862,019 |
| December 15, 2010 | 1,445,000 | 3,417,504 | 4,862,504 |
| June 15, 2011 | 1,510,000 | 3,349,950 | 4,859,950 |
| December 15, 2011 | 1,580,000 | 3,279,358 | 4,859,358 |
| June 15. 2012 | 2,280,000 | 3,205,493 | 5,485,493 |
| December 15, 2012 | 2,390,000 | 3,098,434 | 5,488,434 |
| June 15, 2013 | 2,505,000 | 2,986,210 | 5,491,210 |
| December 15, 2013 | 2,620,000 | 2,868,584 | 5,488,584 |
| June 15, 2014 | 2,745,000 | 2,745,559 | 5,490,559 |
| December 15, 2014 | 2,870,000 | 2,616,664 | 5,486,664 |
| June 15, 2015 | 3,010,000 | 2,481,899 | 5,491,899 |
| December 15, 2015 | 3,150,000 | 2,340,559 | 5,490,559 |
| June 15, 2016 | 3,295,000 | 2,192,644 | 5,487,644 |
| December 15, 2016 | 41,455,000 | 2,037,920 | 43,492,920 |
| | | | |
| Totals | $78,000,000 | $61,882,689 | $139,822,689 |

## SOURCE AND USE OF PROCEEDS

The source of funds and the estimated application thereof are as follows:

*Sources of Funds*

| | |
|---|---|
| Bond Proceeds............................................................................................................ | $78,000,000 |
| Investment Income ...................................................................................................... | 805,248 |
| *Total Sources of Funds*........................................................................................ | $78,805,248 |

*Uses of Funds (Percentage of Funds)*

| | |
|---|---|
| Existing Loan Refinancings *(43.7%)* .......................................................................... | $34,458,004 |
| New Project Expenditures *(39.0%)* ............................................................................. | 30,680,244 |
| Debt Service Reserve Fund *(9.3%)* ............................................................................. | 7,317,000 |
| Prefunded Construction Period Interest *(5.2%)*........................................................... | 4,100,000 |
| Costs of Issuance[*] *(2.8%)*.......................................................................................... | 2,250,000 |
| *Total Uses of Funds*............................................................................................ | $78,805,248 |

_____

[*] Includes placement agent fees, Issuer's financial advisor's fees, counsel fees and trustee's fees

## THE PROJECT

Proceeds of the Bonds will be applied (i) to acquire, construct, install and complete certain telecommunication facilities (the "Property"), (ii) to refinance certain indebtedness (the "Refunded Debt"), (iii) to fund a Debt Service Reserve Fund with respect to the Bonds, (iv) to provide prefunded construction period interest for the Bonds, and (v) to pay certain costs with respect to the issuance and sale of the Bonds.

The Property expenditures to be financed include (i) multiple equipment and software expenditures intended to provide improved business operations and customer service by the Subsidiary Companies in their service area, (ii) expenditures to improve voice and internet service targeted to the tourist sector, and (iii) fiber optic cable expansion expenditures to expand SMITCOMS' international services. *See* "THE SYSTEM" herein.

SMITCOMS has previously executed a contract for the acquisition and installation of the fiber optic cable expansion between SMITCOMS and NSW Submarine Cable Systems, Inc., a Delaware corporation, who was also the contractor for the SMPR-1 Cable. The remaining estimates for Property expenditures are based on bid proposals.

The Property acquisition, construction, installation and completion is part of the expansion program already underway and financed in part with proceeds of the Refunded Debt and in part with expenditures from operating income. The Issuer and the Subsidiary Companies have identified approximately $32 million of "high priority" requirements for System capital expenditures.

## SECURITY FOR THE BONDS

**General**

The Bonds are payable out of and secured by an irrevocable assignment and pledge (but not necessarily an exclusive assignment and pledge) of certain Net Pledged Revenues derived and to be derived from the System after payment of the necessary and reasonable costs and expenses of the operation and maintenance of the System, as more specifically provided in a the Trust Deed  All operating revenues of the System will, immediately upon their receipt or collection, be deposited to the Deposit Account.

**Deposit Account**

A special fund has been created with the Deposit Bank pursuant to the Deposit Agreement and designated the "St. Maarten Telecom Operating Company Deposit Account."  Except as otherwise provided therein or in the Trust Deed, the entire Gross Revenues upon receipt from time to time shall be set aside and credited immediately to the Deposit Account.

The Deposit Account shall be administered and the monies on deposit therein shall be deposited and applied in the following order of priority:

(1)     First, to pay Operation and Maintenance Expenses as they become due and payable;

(2)     Second, to pay to the Paying Agent for deposit to the Bond Fund the next ensuing installment of principal of and interest due under the Trust Deed, plus any deficiencies on previous deposits to the Bond Fund, after credit for any prefunded construction period interest, as described in a schedule of payments included in the Deposit Agreement;

(3)     Third, to pay to the Trustee following notice by the Trustee to the Deposit Bank of a draw on the Debt Service Reserve Fund, amounts necessary to be deposited to the Debt Service Reserve Fund until the amount on deposit therein shall equal the Reserve Fund Requirement;

(4)     Fourth, to the extent the amount on deposit in the Debt Service Reserve Fund as of the first day of any Fiscal Year is less than the amount required to be on deposit therein as of the first day of the following Fiscal Year (other than as a result of a draw on the Debt Service Reserve Fund), as indicated in a certificate of the Issuer or the Trustee delivered to the Deposit Bank prior to the last day of each Fiscal Year, an amount equal to 1/12 of such deficiency, as described in a schedule of payments included in the Deposit Agreement;

(5)     Fifth, upon notice to the Deposit Bank by the Issuer, to the payment of the Debt Service Requirements of Subordinate Indebtedness;

(6)     Sixth, upon notice to the Deposit Bank by the Operating Company, for deposit to a Working Capital Account to be held by the Depository Bank and to be applied to any lawful purpose, upon notice to the Deposit Bank by the Issuer or the Operating Company; and

(7)     Seventh, upon notice to the Deposit Bank by the Operating Company, to any lawful purpose; *provided that*, after January 1, 2008, no disbursements for capital expenditures from Gross Revenue shall be requested unless there shall be on deposit in the Working Capital Account an amount of not less than $3,500,000.

The Working Capital Account can be drawn upon by the Operating Company for any lawful purpose, *provided that*, after January 1, 2008, no disbursements for capital expenditures from such Working Capital Account shall be requested unless there shall be on deposit in the Working Capital Account an amount of not less than $3,500,000.

**Debt Service Reserve Fund**

The Issuer shall maintain in the Debt Service Reserve Fund as a minimum an amount equal to Reserve Fund Requirement.  The moneys in the Debt Service Reserve Fund shall be maintained as a continuing reserve to be used, except as otherwise hereinafter provided, only to prevent deficiencies in payment of the principal of and interest on the resulting from failure to deposit into the Bond Fund sufficient funds to pay such principal and interest as the same accrue. Any amounts on deposit in the Debt Service Reserve Fund on the maturity date of the Bonds will be applied to the payment thereof.

**Additional Security**

In order to secure the obligations of the Issuer under the Trust Deed, each of SMITCOMS, TelEm and TelCell shall each execute a Deed of Assignment instrument (a "Mortgage"), pledging to the Trustee its interest in Gross Revenues, and providing a mortgage or chattel mortgage interest to the Trustee in its interest in System facilities. SMITCOMS, TelEm and TelCell will also assign their respective interests in certain contracts to the Trustee as security for the Bonds. In addition, the Issuer will pledge its interests in the outstanding shares of SMITCOMS, TelEm and TelCell to the Trustee.

24

**Financial Covenants**

The Issuer covenants in the Trust Deed that it will cause rates, fees and charges or any combination thereof which may be imposed by the Issuer for the use of the System to be prescribed, revised and collected which shall be projected to produce Gross Revenues in the following Fiscal Year sufficient to make the payments and accumulations required by the Trust Deed, and which shall be projected to produce annually Net Pledged Revenues sufficient, after payment of Operation and Maintenance Expenses, to pay (i) an amount at least equal to 125% of annual Debt Service Requirements on the Bonds and any Additional Bonds issued pursuant to the Trust Deed during such Fiscal Year, plus (ii) any amounts required to meet then existing deficiencies pertaining to any account secured by the Net Pledged Revenues (including the Debt Service Reserve Fund). In making such calculation for the Fiscal Year ending December 31, 2016, the calculation of Debt Service Requirements will assume the application of the Debt Service Reserve Fund to the payment of the Bonds, and that the unpaid principal amount of the Bonds will be amortized over a period of ten (10) years at the interest rate borne by the Bonds, plus 1%..

In the event that such rates, fees and charges at any time should not be sufficient to make all of the payments and accumulations required by the Trust Deed, the Issuer will seek authorization to increase its rates, fees and charges for the System and reduce Operation and Maintenance Expense to such extent as to insure the payments and accumulations required by the provisions of the Trust Deed.

The Issuer shall also agree to annually calculate the ratio of (i) Net Pledged Revenues during each Fiscal Year to (ii) the sum of (A) Debt Service Requirements for the Bonds made during such period, plus (B) Debt Service Requirements for all other Additional Bonds for such period, and shall provide a copy of such calculation to the Trustee within 45 days after the end of such Fiscal Year. If the ratio computation shall be less than 1.50 to 1.00, the Issuer covenants to retain a Consultant at the expense of the Issuer, within 75 days following the end of such Fiscal Year, to make recommendations to increase such ratio in the Fiscal Year following delivery of such recommendations to such level or, if in the opinion of the Consultant the attainment of such level is impracticable, to the highest level attainable in such Fiscal Year. Any Consultant so retained shall be required to submit such recommendations to the Trustee within 90 days after being so retained. The Issuer agrees that it will, to the extent permitted by law, follow the recommendations of the Consultant. The Issuer shall not be obligated to retain such a Consultant more often than once during any thirty-six month period. In making such calculation for the Fiscal Year ending December 31, 2016, the calculation of Debt Service Requirements will assume the application of the Debt Service Reserve Fund to the payment of the Bonds, and that the unpaid principal amount of the Bonds will be amortized over a period of ten (10) years at the interest rate borne by the Bonds plus 1%.

The Trust Deed requires the Issuer to pay all expenses, taxes, fees and costs associated with the System. There is no act or performance required by the Issuer, the failure of which will excuse the Issuer from its obligations under the Trust Deed, including, but not limited to, its obligations to pay the principal of and interest on the Bonds.

In addition, the Issuer covenants and agrees that it shall maintain a Current Ratio, calculated as of the last day of each calendar quarter, of not less than 1.00 to 1.00. The Issuer shall provide a copy of such calculation to the Trustee at the time of delivery of its quarterly financial statements delivered in accordance with.

Also, the Issuer covenants and agrees that it shall maintain a Debt to Equity Ratio, calculated as of the last day of each Fiscal Year, of not more than 3.50 to 1.00. Following the anticipated sale of shares of SMITCOMS, Inc., by SMITCOMS, the Debt to Equity Ratio shall be adjusted to 2.50 to 1.00. It is anticipated that the Issuer shall apply proceeds of such sale to the optional redemption of Bonds as described herein under "THE BONDS—Prior Redemption—Optional Redemption," or to the purchase of additional assets to maintain such ratio. The Issuer shall provide a copy of such calculation to the Trustee at the time of delivery of the annual audit.

In addition, the Issuer covenants that, for at least five consecutive days during August, November, February and May of each year, commencing in August 2008, amounts on deposit in the Working Capital Account shall be not less than $3,500,000.

The Issuer also covenants and agrees that not more than 10% of its accounts payable (for the deferred purchase price of property or services) from time to time incurred in the ordinary course of operations and activities shall be in excess of 75 day past the invoice or billing date, or, if greater than 75 days, are being contested in good faith by the Issuer.

The Issuer also covenants and agrees that not more than 20% of its accounts receivable (for the deferred purchase price of property or services) from time to time shall be in excess of 90 day past the invoice or billing date, excluding from such calculation (i) amounts being contested in good faith by the obligated party, and (ii) amounts which the Issuer has determined, in good faith, are not likely to be collected and are to be treated as losses in accordance with generally accepted accounting principles.

The foregoing is subject to the limitation that in making such calculations as to accounts payable and accounts receivable, there shall be excluded (i) any accounts receivable from the Government, and (ii) any accounts payable to and accounts receivable from UTS/Antelecom N.V., Radcomm N.V. and East Caribbean Cellular, N.V., until such time as disputes with such entities with respect to receivables and payables have been settled. *See* "LITIGATION" herein.

Neither the Trust Deed nor the Bonds constitute a general obligation of the Government. The Bonds will be payable during the term of the Trust Deed solely from payments to be paid by the Issuer under the Trust Deed.

## ST. MAARTEN

Traditionally, the Island of Sint Maarten is said to have been named by Christopher Columbus when he spotted the land on the feast of St. Martin of Tours, who lived from 330 to 397 as a bishop and missionary in France. Today, the island is called "Sint Maarten" in Dutch spelling and "St Martin" in French, Spanish, Italian, and English spelling.

The first settlers on the island were a tribe of Arawak Indians who left their homeland in the Orinoco basin of South America and migrated along the chain of Caribbean islands. The Arawaks were a relatively cultured and peaceful tribe, and introduced agriculture and pottery, and a well structured social organization to the country. Later the Arawaks were subjugated by the more aggressive tribe of Carib Indians, who came down from North America in the early 14th century, and later gave the entire Caribbean its name.

As the Spaniards conquered the islands in the 16th century, they introduced the first slaves to the area. The main influx of slaves however started in the 18th century with the French sugar plantations. Slavery was officially abolished in 1848, following which the British brought in Chinese and East Indians to work. As a result, the island is populated by a mixture of Indians, Africans, Asians and Europeans.

In the mid 17th century, pirates, smugglers and privateers were attracted to the Caribbean by the increasing volume of West Indies trade, and of the increasing number of ships between Europe and Americas, especially since cargo included silver and other precious merchandise from South America. Pirates and smugglers were condoned, even encouraged, by the European countries fighting for control over the Caribbean seas and islands. England, Spain, Portugal, Denmark, the Netherlands and France "island-hopped" by means of naval assaults. Between 1630 and 1648, of the neighboring islands, the Dutch had also seized Saba and St. Eustatius, all trading and smuggling depots. The British had seized Anguilla. The French established their "Compagnie des Iles d'Amerique" on St. Martin in 1635, and their joint rule with the Dutch began in 1648, one year after the Spaniards had sailed off and abandoned the island. A treaty was signed on top of Mount Concordia in 1648, but despite the claim of peaceful cohabitation, the border was to change numerous times until 1815 when the Treaty of Paris fixed the boundaries.

The cultivation of sugar cane, tobacco, cotton and coffee in the 18th century came along with slavery, and African men, women, and children were imported by the numbers. Soon they exceeded the small population of European planters, merchants and professionals. The growth of trade in sugar, rum and slaves made the possessions in the West Indies a primary target of European colonialism. The end of slavery, in conjunction with much cheaper competition in the sugar and other industries, had a significant impact on the island, as plantations died out and no industry followed to take the place of the loss of the agricultural base.

In 1914 there were approximately 3,000 people living on St. Martin, and by the end of 1930 the number had dropped to 2,000. However, during World War II, the US Army built a runway on Sint Maarten in connection with protection against German submarine operations. Following the war, and benefited by the air transport facilities installed by the US Army, the Dutch and French began developing the tourist industry, which now is the prime economic activity of the island.

**Government Structure**

The Island of St. Maarten/St. Martin has two separate areas. The French (north) side of the island is a territory of France. The Dutch (south) side is part of the Netherlands Antilles. The Netherlands Antilles is a group of five islands in the Caribbean region (Curaçao, St Maarten, Bonaire, St Eustatius and Saba). The Netherlands Antilles are a self-governing entity within the Kingdom of the Netherlands. They are responsible (autonomous) for the conduct of their internal affairs. (At the present time, Aruba and Netherlands Antilles are the two separate Caribbean entities which are part of the Dutch Kingdom). The form of government in the Netherlands Antilles is a parliamentary democracy.

The governance structure of the Netherlands Antilles can be detailed on three levels:

1.    The Kingdom of the Netherlands.
2.    The Federal government.
3.    The island government.

**Kingdom of the Netherlands**

The Queen of the Netherlands is the Head of State of the Kingdom and of the three constituent entities. The Queen is represented by the Governor Generals in the Netherlands Antilles and in Aruba.

The Kingdom has a Kingdom Government (Council of Ministers) which is responsible for a limited range of affairs. The Kingdom is in particular responsible for:

- defense;
- external affairs;
- citizenship;
- navigation of seagoing vessels that fly the flag of the Kingdom;
- admission, expulsion and extradition; and
- guaranteeing fundamental human rights, legal protection and good governance.

The Kingdom Government has the authority to intervene in the affairs of the Netherlands Antilles or Aruba if and when international obligations or the laws of the Kingdom are not properly upheld, or to prevent potential conflicts of interests in the affairs of the Kingdom. In such instances, the Kingdom Government must determine the appropriate means for resolving these issues. For example, the Governor General may use his or her powers as representative of the Kingdom to block legislative and administrative acts of the government of his or her entity. Also, the Kingdom Government may act through an administrative measure issued by the Government of the Netherlands Antilles to safeguard good governance of an island territory.

The Statue of the Kingdom, adopted in 1954, ended the colonial relationship between the Netherlands and the Netherlands Antilles. The Statute establishes a jurisdiction in which these entities look after their domestic interests autonomously, look after their common interests on egalitarian basis, and provide each other with mutual assistance.

In 1986 Aruba left the Netherlands Antilles, obtaining a separate status within the Kingdom. As a consequence, the Kingdom presently consists of three entities: the Netherlands, the Netherlands Antilles and Aruba.

The Kingdom of the Netherlands is a Member State of the European Union (EU). However, the Netherlands Antilles and Aruba are not considered part of the EU. As overseas entities of the Kingdom, the Netherlands Antilles and Aruba are 'associated' with the EU. They belong to the group of 21 so-called OCTs: non-independent Overseas Countries.

The legal system in the Netherlands Antilles is based on Dutch civil law. The administration of justice is exercised by the Common Court of Justice of the Netherlands Antilles and Aruba and is independent of the legislative and executive branches of government. The Common Court of Justice consists of the Court of First Instance of the Netherlands Antilles, The Court of First Instance of Aruba, and the Court of Appeals operated jointly by the Netherlands Antilles and Aruba. All cases can ultimately be appealed to the Supreme Court of the Netherlands in The Hague.

**The Federal level**

Governance at the Federal (Netherlands Antilles) level consists of:

- The Governor General representing and appointed by the Dutch Queen, as the Head of State..

- A 22-member Parliament consisting of 14 representatives from Curaçao, three from St Maarten, three from Bonaire, one from St Eustatius and one from Saba.

- The Council of Ministers (Cabinet) appointed upon nomination by the political parties that have formed a coalition based on a majority of seats in Parliament. The term for this council is four years. The chairman of the Council of Ministers is the Prime Minister of the Netherlands Antilles.

The Central Government's jurisdiction covers national legislation and supervision in policy areas such as public health, education, economics, labor, transport and communications, finance and taxes, but also includes operations in such areas as law enforcement, security, customs and immigration, and central banking. The Central Government of the Netherlands Antilles is headquartered in Willemstad, the capital of Curaçao.

**Island level**

The island governments are responsible for the everyday affairs of their territories, as stipulated in the Islands Regulation of the Netherlands Antilles.

The governance of each island territory consists of:

- a Lieutenant Governor appointed by the Dutch Crown upon recommendation of the Central Government for a term of six years;

- an Island Council elected every four years;

- an Executive Council appointed by the Island Council, in charge with the day to day operation of the Island Government.

The Island Council of St. Maarten consists of eleven elected members. The Executive Council consists of five members.

**Constitutional Status**

In accordance with a referendum on the island of St. Maarten conducted in 2000, voters in St. Maarten determined that St. Maarten should no longer be a member of the Netherlands Antilles, but should instead become an autonomous country within the Kingdom of the Netherlands, as Aruba is presently. Curacao also determined to become an autonomous country within the Kingdom, while the other three smaller islands of the Netherlands Antilles (Bonaire, St. Eustatius and Saba) have decided to have direct relations with the Netherlands. St. Maarten has determined that a primary benefit will arise from the fact that Island Government presently supports the Federal Government with taxes in excess of federal services.

The discussions with the Kingdom pertaining to the changes in the constitutional status began with the first Round Table conference in November 2005, at which the government of the Kingdom concurred with the change in constitutional status of the member governments of the Netherlands Antilles. It was agreed that St. Maarten and Curacao will become separate countries within the Kingdom of the Netherlands, and that the government at the Federal Level will subsequently be dissolved. It is the aim of the Kingdom partners that in 2007 this new constitutional status will be ready and implemented.

Matters which have historically been controlled at the Kingdom level (including judicial matters, foreign affairs, defense, Dutch citizenship and human rights matters) will remain in place controlled at the Kingdom level. St. Maarten anticipates more autonomy to develop independently of the Federal Level and with the direct support of the Netherlands. It will be empowered, to a certain extent, to adopt legislation more specifically beneficial to the tourism-centered economy of St. Maarten.

**Central Bank**

Monetary issues in the Netherlands Antilles are the responsibility of the Central Bank. The Bank operates to maintain the external stability of the Netherlands Antillean guilder (NAf.), and to promote the efficient functioning of the financial system in the Netherlands Antilles. The functions of the Bank, as stated in the Bank Charter, are:

**First**, the Bank is the only institution entitled by law to issue paper money in the Netherlands Antilles. The Bank also is charged with the circulation of coins.

**Second**, the Bank supervises banking and credit institutions.

**Third**, the Bank manages the foreign exchange reserves of the Netherlands Antilles, which includes regulating of the transfer of payments between residents and nonresidents of the Netherlands Antilles.

**Finally**, the Bank acts as the government's treasurer by receiving and making payments from and to the public through the tax collector's accounts at the Central Bank.

To strengthen the Central Bank's independent position vis-à-vis the government, the Bank Charter limits the monetary financing of budget deficits to 10% of the central government's revenues in the previous year.

The monetary policy of the Bank during the last two decades has been geared toward promoting a stable value of the NAf with respect to the US dollar. Since 1971 the official NAf/$ rate of 1.79 has been supported by the monetary authorities. The Bank's main reason for pegging the NAf to the US dollar is that over the years, more than 60% of its international trade relations have been conducted with the

United States or in US dollars. To maintain the dollar standard, the Bank must ensure a sufficient supply of foreign exchange. To manage the foreign exchange reserves of the Netherlands Antilles, the Bank in the past has exerted control over the credit extended by commercial banks.

THE ISSUER

**General**

Sint Maarten Telecommunications Holding Company, NV is a limited liability company organized under the laws of the Netherlands Antilles on November 6, 2006.

The Government of the Island Territory of St. Maarten, Netherlands Antilles determined that the viability of Government owned telecommunications companies would be dependent on the integration of all business units. Such integration would eliminate any inter-company competition and better utilize available human resources. The Island Council then took action to approve the creation of the Issuer and the Operating Company, and the transfer of shares in TelEm, TelCell and SMITCOMS to the Issuer. At the same time, the Government decided that TelNet would be merged into TelEm, and the activities of TelNet would be transferred to TelEm.

It was also determined that certain of the staff of the Subsidiary Companies would be transferred to the Operating Company, based on their assessment, qualifications and experience. Vested employment rights and benefits would also be respected.

The organization of the Issuer and the Subsidiary Companies is shown in the following:

*Figure 1: Organizational Structure*



**Management**

The operating activity of the Issuer shall be governed by a Supervisory Board, initially appointed by the Government. The Board will also act as the governing body of each Subsidiary Company.

<strong>Supervisory Board of Directors</strong>

Mr. Joseph E. Richardson, Chairman
Mr. Rudolf A. Hoeve, Vice-Chairman
Ms. Peggy Ann M. Brandon
Mr. Steven R. Constance
Mr. Kelvin L. Bloyden
Ms. Wanukie A. R. Hodge
Mr. Paul N. Marshall

In addition, management of the Operating Company shall be the direct responsibility of the Operating Company's Executive Board, consisting of the Chief Executive Officer, the Chief Financial Officer and the Chief Operational Officer of the Operating Company.

Overall performance and integrity of the Operating Company is the responsibility of the Chief Executive Officer, who is also the Chairman of the Executive Board. Mr. Joseph Richardson is the interim Chief Executive Officer .The CEO will represent the Executive Board to the Supervisory Board and shareholders and will be responsible for budgetary planning, and will monitor overall strategic, financial and operational performance of the Operating Company. The CEO will also be tasked with monitoring developments in the telecom market and customer market and with aligning business strategy in response to those markets.

Other management personnel include:

- The **Chief Operational Officer** -- responsible for the development, implementation and monitoring of the operational business strategy of the Issuer.

- The **Chief Financial Officer** -- responsible for the development, implementation and monitoring of the financial business strategy of the Issuer.

- The **Director Human Resources** --- responsible for the Human Resources Management and Development, Legal Affairs & Contracts, Public Relations and General Affairs.

- The **Director Technical Operations** --- responsible for the operation of the technical infrastructure (landlines, mobile and international sea cable).

- The **Manager Commercial Affairs** ---  responsible for the customer service and sales of TelEm products and services and relations with international carriers.

The Organization Chart reflects the management organization of the Issuer:

*Figure 2: Organizational Chart:*



In November of 2006, the Supervisor Board appointed Mr. Joseph Richardson as interim Chief Executive Officer of the Issuer. The Board determined to solicit résumés for a permanent Chief Executive Officer, who is anticipated to be hired by the end of 2006. Prior to that time, the Board also anticipates soliciting resumes for other executive positions within the Issuer. Mr. Richardson has determined that in the interim, existing management at TelEm and SMITCOMS will continue to be responsible for operations of the Subsidiary Companies.

*Joseph Emanuel Richardson* is the interim Chief Executing Officer of the Issuer. Mr. Richardson is an administrator in general services of the Island Government St. Maarten, and a Supervisory Director of Saba Bank Resources NV. Mr. Richardson has served in various positions in the Government or in Netherlands Antilles government, including Administrator of Saba; Notary of Saba; Member of Island Council and Executive Council of Island Territory the Windward Islands, Section Sint Maarten; Member of the Kingdom Committee (restructuring Kingdom of the Netherlands); Second Acting Lt. Governor of Sint Maarten; Member of Parliament of the Netherlands Antilles representing the Windward Islands and Member of the Island Council and Executive Council of Sint Maarten.

*Curtis Haynes* is the Managing Director of SMITCOMS, tasked with all general management of the expansion and operation of the international telecommunications services provided by SMITCOMS within the Caribbean region. He has also been the responsible for the coordination of the merger of the Government-owned telecommunications companies in Sint Maarten. Prior to that he was president and director of TelEm, Managing Director of TelCell, and Managing Director of TelNet Communications NV. Mr. Haynes has also been managing Director of Curud Consulting NV, which provided telecommunication consulting to Government, offshore and local Telecommunication Companies on the Netherlands Antilles and Caribbean. He was chief executive officer and chief operating officer of Water and International NV Ltd and Global Media Services International Ltd. in charge of a number of off shore companies in the Caribbean and Monaco with specialization in telecommunication information services.

*Edward Benjamin* is president of TelEm. Mr. Benjamin has worked in the telecommunication industry, beginning as an employee of the public utilities company before taking the position of switching technician at the government-owned Telecommunication Company Landsradio. Mr. Benjamin held the position of Managing Director of East Caribbean Cellular; St. Maarten Cable TV and St. Maarten Mobiles until 1991, when he returned to the private sector as a self-employed consultant. He was appointed as Deputy Director Technical Operations at TelEm in 2004, and President the following year. As the chief executive officer of TelEm, he is responsible for the daily operation of the company. Mr. Benjamin is a graduate of the Brooklyn Institute of Computer technology, the Hogere Technshce School te Enshede, John F. Kennedy, UTS Elecktrotechnick Collegio Arubano, HBS-B Abraham de Veer School, and MULO-B Pieter Noer School, Aruba.

**Employees**

It is anticipated that the integration of the Subsidiary Company operations into the Operating Company will result in some employee redundancy. In connection with the reorganization, management of the Issuer will be tasked first with completing full job descriptions for the integrated operations. It will then be necessary to identify (i) pre-reorganization employees whose skills and qualifications best match those descriptions and can transfer into a new position without additional training, (ii) pre-reorganization employees whose skills can be utilized in new positions resulting from the re-organization (which employees will be afforded additional training opportunities within the Operating Company), and (iii) pre-reorganization employees whose services will not be required. Terminated employees who have vested retirement rights will be afforded the opportunity to exercise those rights, and all terminated employees will benefit from a severance arrangement, based upon their employment classification and years of service. The employment plan was approved by union representatives on behalf of the membership.

**Revenues and Expenditures**

There follows a summary of revenues and expenses of the TelEm and related entities and SMITCOMS for the years ended December 31, as indicated below.  KPMG Accountants BV compiled the consolidation schedule (originally presented in Netherlands Antilles Guilders and converted based on current exchange rates) based on the audited consolidated financial statements of TelEm and its subsidiaries and the audited financial statements of SMITCOMS NV.  KPMG Accountants BV has not audited or reviewed the consolidation schedule and expresses no assurances thereon.

**Management Discussion of Revenues and Expenditures**

As the incumbent telecommunication provider, the Sint Maarten Telephone Company N.V. and its subsidiaries, TelCell N.V. and TelNet Communication N.V. enjoys a strategic advantage as owner of St. Maarten's telecommunication infrastructure. This, coupled with the ownership of a premier undersea cable line via SMITCOMS N.V. allows the Sint Maarten Telephone Company N.V. and its subsidiaries

TelCell N.V. and TelNet Communications N.V., and SMITCOMS N.V. the further advantage of guiding telecommunication development on the island through the maintenance and future development strategies of the internal and external telecommunication backbone.

The full potential for increased bandwidth made possible by SMITCOMS N.V. through the lease of IRU fiber strands in SMPR-1, remains to be fully exploited along with the equally exciting potential of Internet-related services available via subsidiary company TelNet Communications N.V.

The extenuating factor of St. Maarten's quest for "Country Status" and the optimism for a more "nationalistic" telecommunication policy gives further cause for expectation of increased profit margins for the Sint Maarten Telephone Company N.V. and its subsidiaries, TelCell N.V. and TelNet Communication N.V. and SMITCOMS N.V.

*Revenues.* The Consolidated Financial Statements of the Sint Maarten Telephone Company N.V. and SMITCOMS N.V., indicates a significant increase in revenues for 2005 over the year 2004 mainly from the primary forms of revenue, namely:

- GSM Roaming revenues and Mobile phone card sales from TelCell N.V.

- Administration fees and PABX sales by the Sint Maarten Telephone Company N.V.

- Capacity lease increase of IRU fiber strands in SMPR-1 by SMITCOMS N.V.

*Expenses* .An increase in expenses for the year 2005 over 2004 is attributable to the cost of sales of increased revenues and an increase of Interest costs, personnel costs, consultancy costs and depreciation.

The Increase In cost of sales relates to increase in interconnect expenses and the fees due to the Regulatory body, the Bureau Telecommunicatie en Post, both as a consequence of an Increase customer base and an Increase In traffic from calls.

*Total Assets--Fixed Assets:* Depreciation is higher than investment with the result of a decrease in book value of assets for the year ended December 31, 2005 compared to the year 2004.

*Total Assets--Current Assets*: An increase in Accounts Receivable in the year 2005 compared to the year 2004 for the Sint Maarten Telephone Company N.V., TelCell NV, TelNet Communications NV and SMITCOMS N.V. is mainly caused by increased revenues.

*Liabilities.* Current liabilities in 2005 compared to 2004 have increased due to and Increase in accrued expenses and accounts payable.

A significant increase in the long-term liabilities of SMITCOMS N.V. and a less significant increase for TelNet Communications N.V., for the year 2005 is offset by more favourable decreases in the long-term liability amounts for the Sint Maarten Telephone Company N.V., and TelCell N.V., for the year ended December 31, 2005.

Total liabilities have decreased over the year ended December 31, 2005 compared to December 31, 2004.

*Equity*. Equity decreased in 2005 compared to 2004 as a result of the loss in 2005.

*Results of Operations.* Net income from operation doubled in 2005 compared to 2004 due to an increase in revenues which were higher than an Increase In operational expenses, however, Net income after Profit Tax decreased due to higher finance costs in 2005 compared to 2004.

## STATEMENT OF INCOME FOR THE PERIOD 2001-2005

|  | 2005 | 2004 | 2003 | 2002 | 2001 |
|---|---|---|---|---|---|
| **TOTAL REVENUES** | **$44,297,079** | **$38,664,430** | **$37,768,142** | **$33,785,642** | **$33,199,739** |
| **EXPENSES** | | | | | |
| Personnel Expense | 10,452,487 | 9,848,989 | 9,820,156 | 9,293,507 | 8,651,192 |
| Telecommunication | 12,853,111 | 11,401,738 | 10,225,975 | 7,465,970 | 7,292,545 |
| Accommodation | 2,356,228 | 2,257,885 | 2,187,385 | 2,074,122 | 2,305,521 |
| General & Admin. | 7,312,669 | 5,999,003 | 4,908,811 | 4,713,631 | 5,376,404 |
| Depreciation | 8,923,811, | 7,669,690 | 7,059,303 | 6,167,546 | 6,825,063 |
| **Total Expenses** | **41,898,306** | **37,207,304** | **34,201630** | **29,714,777** | **30,378,180** |
| **Result before other   income/expenses   and   extra ordinary expense** | **2,398,774** | **1,457,125** | **3,566,512** | **4,070,865** | **2,821,559** |
| **OTHER INCOME/(EXPENSES)** | | | | | |
| Finance cost Net[9] | (2.980,187) | (1,782,970) | (1,505,701) | (1,719,563) | (1,917,007) |
| Other income/(expense) | 274,663 | 34,058 | (38,559) | (8,533) | (83,861) |
| Bad debt expense | (346,348) | (414,150) | (1,130,611) | (2,926,282) | (2,714,766) |
| Prior year adjustments | | | 321,998 | 2,322,071 | |
|  | **(3,051,881)** | **(2,163.062)** | **(2,352872)** | **(2,332,307)** | **(4,715,634)** |
| **EXTRA ORDINARY EXPENSE** | | | (111,194) | | |
| **NET INCOME BEFORE TAXES** | **(653,348)** | **(705,937)** | **1,102,445** | **1,738,558** | **(1,894,075)** |
| Profit Tax[1] | - | - | - | (164,298) | |
| Release deferred tax | 134,342 | 765,713 | 469,146 | 151,099 | |
| **NET INCOME (LOSS) AFTER PROFIT TAX** | **($516,866)** | **$59,776** | **$1,571,591** | **$1,725,359** | **($1,894,075)** |

**Management Projections**

The following are the Issuer's projections of the profit and loss statement, the balance sheet and the cash flow statement for the years 2006 through 2014 of the consolidated TelEm, SMITCOMS, TelCell and TelNet, along with accompanying notes. Projections of revenues and operating expense are based on assumptions deemed reasonable by the Issuer in the circumstances in which they have been made, but such assumptions have not been independently verified or reviewed. Actual results realized by the Issuer will vary from any projections, and such variance may be material. KPMG Accountants BV examined the combined projections and notes on mathematical accuracy, and determined that the projections for the years 2006-2015 are mathematically correct.

**Combined statement of income and cashflows**

*(Amounts in USD)*

| P&L STATEMENTS COMBINED | Audited 2005 | Extrap. 2006 | Projected 2007 | Projected 2008 | Projected 2009 | Projected 2010 | Projected 2011 | Projected 2012 | Projected 2013 | Projected 2014 |
|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | | | | | |
| Fixed Network Revenue incl Reinvested income | 17,717,587 | 18,474,932 | 18,325,863 | 16,912,413 | 15,121,066 | 12,982,006 | 12,610,678 | 12,230,112 | 11,855,236 | 11,499,931 |
| Cellular Network Revenue | 12,172,139 | 16,713,522 | 18,595,579 | 19,257,957 | 19,706,532 | 19,985,890 | 20,093,828 | 20,210,306 | 20,335,272 | 20,468,682 |
| Data Network Revenue | 2,344,412 | 2,712,411 | 4,869,624 | 7,021,638 | 8,352,735 | 9,607,854 | 10,994,384 | 11,434,293 | 11,774,517 | 12,033,281 |
| International Traffic Revenue | 11,570,752 | 14,469,415 | 16,827,566 | 24,739,198 | 24,489,634 | 24,387,451 | 24,811,094 | 25,856,475 | 26,951,858 | 28,099,699 |
| Other revenue | 271,612 | 335,574 | 523,221 | 519,890 | 516,492 | 513,027 | 513,027 | -77,066 | -77,066 | -77,066 |
| **TOTAL REVENUE** | **44,076,501** | **52,705,854** | **59,141,853** | **68,451,097** | **68,186,458** | **67,476,228** | **69,023,011** | **69,654,119** | **70,839,817** | **72,024,527** |
| | | | | | | | | | | |
| Operational expenses | 32,608,112 | 39,310,049 | 41,771,753 | 42,479,602 | 40,720,681 | 40,601,529 | 40,311,721 | 44,028,150 | 44,157,180 | 44,403,451 |
| Bad Debt Expense | 342,499 | 1,102,792 | 1,228,659 | 1,275,127 | 1,302,577 | 1,312,604 | 1,369,069 | 1,397,631 | 1,424,093 | 1,449,343 |
| Cost of loan, other cost related to prepayment of existing loans | 0 | 0 | 4,510,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **TOTAL OPERATIONAL EXPENSES** | **32,950,611** | 40,412,842 | **47,510,412** | 43,754,729 | 42,023,258 | 41,914,133 | 41,680,791 | 45,425,781 | 45,581,273 | 45,852,793 |
| | | | | | | | | | | |
| **OPERATIONAL INCOME (EBITDA)** | **11,125,890** | **12,293,012** | **11,631,441** | **24,696,368** | **26,163,200** | **25,562,095** | **27,342,220** | **24,228,338** | **25,258,545** | **26,171,734** |
| **DEBT SERVICE COVERAGE** | | | | **2.66** | **2.69** | **2.63** | **2.81** | **2.21** | **2.30** | **2.38** |
| | | | | | | | | | | |
| **FINANCIAL (INCOME)/EXPENSES** | | | | | | | | | | |
| Depreciation | 8,824,657 | 7,135,756 | 7,774,808 | 7,877,189 | 8,422,601 | 8,992,243 | 9,369,955 | 9,780,008 | 10,190,061 | 10,600,114 |
| Depreciation (New Services) | 0 | 0 | 402,815 | 468,741 | 468,741 | 468,741 | 468,741 | 468,741 | 468,741 | 468,741 |
| **Depreciation (Ntwk., Facil., IT) & in 2006 10% cost of the new Loan** | 0 | 0 | 222,994 | 445,988 | 537,100 | 650,433 | 705,988 | 705,988 | 705,988 | 705,988 |
| Depreciation (New building) | 0 | 0 | 209,130 | 209,130 | 209,130 | 209,130 | 209,130 | 209,130 | 209,130 | 209,130 |
| Depreciation (SMPR-1 Cable Expansion) | 0 | 0 | 0 | 1,120,741 | 1,120,741 | 1,120,741 | 1,120,741 | 1,120,741 | 1,120,741 | 1,120,741 |
| *Subtotal depreciation* | *8,824,657* | *7,135,756* | *8,609,747* | *10,121,788* | *10,758,311* | *11,441,287* | *11,874,554* | *12,284,607* | *12,694,660* | *13,104,713* |
| Interest Expense current loan | 2,947,083 | 2,882,037 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Interest Expense Sofitel & NWN | 0 | 0 | 143,879 | 152,250 | 0 | 0 | 0 | 0 | 0 | 0 |
| Interest Expense consolidated loan | 0 | 0 | 7,317,000 | 7,317,000 | 7,145,723 | 6,899,212 | 6,629,114 | 6,303,388 | 5,854,268 | 5,361,978 |
| *Subtotal interest* | *2,947,083* | *2,882,037* | *7,460,879* | *7,469,250* | *7,145,723* | *6,899,212* | *6,629,114* | *6,303,388* | *5,854,268* | *5,361,978* |
| **TOTAL FINANCIAL (INCOME)/EXPENSE** | **11,771,741** | **10,017,792** | **16,070,626** | **17,591,039** | **17,904,034** | **18,340,500** | **18,503,669** | **18,587,996** | **18,548,929** | **18,466,691** |
| | | | | | | | | | | |
| **NET PROFIT BEFORE TAXES** | **-645,850** | **2,275,220** | **-4,439,185** | **7,105,330** | **8,259,166** | **7,221,595** | **8,838,551** | **5,640,342** | **6,709,616** | **7,705,043** |
| Profit tax & Release deferred profit tax in 2005 | -132,750 | | | | | | | | | |
| **NET PROFIT AFTER TAXES** | **-513,100** | **2,275,220** | **-4,439,185** | **7,105,330** | **8,259,166** | **7,221,595** | **8,838,551** | **5,640,342** | **6,709,616** | **7,705,043** |

| CASH FLOWS COMBINED | Audited 2005 | Extrap. 2006 | Projected 2007 | Projected 2008 | Projected 2009 | Projected 2010 | Projected 2011 | Projected 2012 | Projected 2013 | Projected 2014 |
|---|---|---|---|---|---|---|---|---|---|---|
| *(Amounts in USD)* NET PROFIT AFTER TAXES | -513,100 | 2,275,220 | -4,439,185 | 7,105,330 | 8,259,166 | 7,221,595 | 8,838,551 | 5,640,342 | 6,709,616 | 7,705,043 |
| *Add depreciation* | 8,824,657 | 7,135,756 | 8,609,747 | 10,121,788 | 10,758,311 | 11,441,287 | 11,874,554 | 12,284,607 | 12,694,660 | 13,104,713 |
| *add interest* | 2,947,083 | 2,882,037 | 7,460,879 | 7,469,250 | 7,145,723 | 6,899,212 | 6,629,114 | 6,303,388 | 5,854,268 | 5,361,978 |
| *Movement in accounts receivable* | -2,322,994 | -2,871,910 | -1,980,307 | -2,548,015 | -756,995 | 946,938 | -971,997 | -725,469 | -874,782 | -874,516 |
| **Cash flow from operations** | **8,935,646** | **9,421,102** | **9,651,134** | **22,148,353** | **25,406,205** | **26,509,033** | **26,370,223** | **23,502,869** | **24,383,763** | **25,297,218** |
| **Add: Cash inflows** | | | | | | | | | | |
| Funding Loans | 2,844,074 | 13,595,455 | 78,000,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Funding Sofitel & NWN | 2,821,783 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Receipt old accounts receivables/Island govt. | 0 | 0 | 555,556 | 555,556 | 555,556 | 555,556 | 555,556 | 555,556 | 555,556 | 0 |
| Reduce backlog other outstanding | 0 | 0 | 444,444 | 277,778 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sale of cable (76%) | 0 | 0 | 11,111,111 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **5,665,858** | **13,595,455** | **90,111,111** | **833,333** | **555,556** | **555,556** | **555,556** | **555,556** | **555,556** | **0** |
| **Less: Cash outflows** | | | 37,307,936 | | | | | | | |
| Loan repayments | 4,209,136 | 7,667,535 | 37,307,936 | 1,202,489 | 2,576,255 | 2,822,766 | 3,092,864 | 4,672,634 | 5,121,755 | 5,614,045 |
| Loan repayment Sofitel & NWN | 456,487 | 895,799 | 863,589 | 605,909 | 0 | 0 | 0 | 0 | 0 | 0 |
| Interest payments | 2,947,083 | 2,882,037 | 7,460,879 | 7,469,250 | 7,145,723 | 6,899,212 | 6,629,114 | 6,303,388 | 5,854,268 | 5,361,978 |
| CAPEX infrastructure | 6,062,752 | 7,178,474 | 3,927,778 | 5,651,893 | 4,707,448 | 2,475,226 | 2,870,371 | 2,870,371 | 2,870,371 | 2,870,371 |
| CAPEX infrastructure (Ntwk., Facil., IT) | 0 | 3,344,914 | 3,344,914 | 1,366,667 | 1,700,000 | 833,333 | 0 | 0 | 0 | 0 |
| CAPEX infrastructure (SMPR-1 Cable Exp) | 0 | 0 | 16,811,111 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CAPEX new building | 0 | 3,136,944 | 3,585,278 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Payment of claim ecc | 2,228,451 | 748,296 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Balance remaining Cash flow items | -756,908 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **15,147,001** | **25,853,999** | **73,301,484** | **16,296,207** | **16,129,426** | **13,030,538** | **12,592,349** | **13,846,393** | **13,846,393** | **13,846,393** |
| **Cash flow after investments and debt payment (principal + interest)** | **-545,497** | **-2,837,442** | **26,460,760** | **6,685,479** | **9,832,334** | **14,034,051** | **14,333,430** | **10,212,031** | **11,092,925** | **11,450,824** |
| **Cash Jan 1** | 2,934,584 | 2,389,087 | -448,354 | 26,012,406 | 32,697,884 | 42,530,218 | 56,564,269 | 70,897,699 | 81,109,730 | 92,202,655 |
| **Total cash Dec 31** | **2,389,087** | **-448,354** | **26,012,406** | **32,697,884** | **42,530,218** | **56,564,269** | **70,897,699** | **81,109,730** | **92,202,655** | **103,653,479** |
| Debt reserve accounts | | | 7,317,000 | 8,519,489 | 9,721,978 | 9,721,978 | 9,721,978 | 10,976,023 | 10,976,023 | 10,976,023 |
| **Free cash flow** | **2,389,087** | **-448,354** | **18,695,406** | **24,178,395** | **32,808,240** | **46,842,291** | **61,175,721** | **70,133,707** | **81,226,632** | **92,677,456** |

| BALANCE SHEETS COMBINED | Audited 2005 | Extrap. 2006 | Projected 2007 | Projected 2008 | Projected 2009 | Projected 2010 | Projected 2011 | Projected 2012 | Projected 2013 | Projected 2014 |
|---|---|---|---|---|---|---|---|---|---|---|
| *(Amounts in USD)* | | | | | | | | | | |
| Tangible Fixed Assets | 54,148,412 | 60,672,989 | 68,621,211 | 65,517,982 | 61,167,119 | 53,034,391 | 44,030,208 | 34,615,971 | 24,791,681 | 14,557,338 |
| Investment in subsidiaries and associate | 8,486 | 8,486 | 8,486 | 8,486 | 8,486 | 8,486 | 8,486 | 8,486 | 8,486 | 8,486 |
| Deferred Expenses (Net) | 387,668 | 387,668 | 387,668 | 387,668 | 387,668 | 387,668 | 387,668 | 387,668 | 387,668 | 387,668 |
| Current Assets (ex cash and accounts receivable) | 6,258,777 | 6,258,777 | 6,258,777 | 6,258,777 | 6,258,777 | 6,258,777 | 6,258,777 | 6,258,777 | 6,258,777 | 6,258,777 |
| Accounts receivable | 13,345,276 | 16,217,186 | 17,197,493 | 18,912,175 | 19,113,615 | 17,611,121 | 18,027,563 | 18,197,477 | 18,516,703 | 19,391,219 |
| Cash | 2,389,087 | -448,354 | 26,012,406 | 32,697,884 | 42,530,218 | 56,564,269 | 70,897,699 | 81,109,730 | 92,202,655 | 103,653,479 |
| **TOTAL ASSETS SHAREHOLDER'S EQUITY/LIABILITIES** | **76,537,707** | **83,096,752** | **118,486,042** | **123,782,974** | **129,465,884** | **133,864,714** | **139,610,401** | **140,578,109** | **142,165,971** | **144,256,968** |
| SHAREHOLDER'S EQUITY | 26,074,470 | 28,349,690 | 23,910,505 | 31,015,835 | 39,275,000 | 46,496,596 | 55,335,147 | 60,975,489 | 67,685,105 | 75,390,148 |
| **DEFERRED TAX LIABILITY/INCOME (PROVISIONS)** | 764,819 | 764,819 | 764,819 | 764,819 | 764,819 | 764,819 | 764,819 | 764,819 | 764,819 | 764,819 |
| Long-Term Liabilities | 28,130,084 | 37,307,936 | 78,000,000 | 76,797,511 | 74,221,255 | 71,398,490 | 68,305,626 | 63,632,991 | 58,511,237 | 52,897,192 |
| Current Liabilities | 21,568,333 | 16,674,307 | 15,810,718 | 15,204,809 | 15,204,809 | 15,204,809 | 15,204,809 | 15,204,809 | 15,204,809 | 15,204,809 |
| **TOTAL LIABILITIES** | **50,463,237** | **54,747,062** | **94,575,537** | **92,767,139** | **90,190,884** | **87,368,118** | **84,275,254** | **79,602,620** | **74,480,865** | **68,866,820** |
| **TOTAL SHAREHOLDER'S EQUITY AND LIABILITIES** | **76,537,707** | **83,096,752** | **118,486,042** | **123,782,974** | **129,465,884** | **133,864,714** | **139,610,401** | **140,578,109** | **142,165,971** | **144,256,968** |
| Balance check | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Financial covenants** | | | | | | | | | | |
| Debt Service Reserve Account | | | 7,317,000 | 8,519,489 | 9,721,978 | 9,721,978 | 9,721,978 | 10,976,023 | 10,976,023 | 10,976,023 |
| Debt coverage ratio (1.5 to 1) | | | NA | 2.66 | 2.69 | 2.63 | 2.81 | 2.21 | 2.30 | 2.38 |
| Debt to Equity Ratio (1.5 to 1) | | | 3.26 | 2.48 | 1.89 | 1.54 | 1.23 | 1.04 | 0.86 | 0.70 |
| Current Ratio (1 to 1) | | | 2.04 | 2.56 | 3.21 | 4.13 | 5.07 | 5.75 | 6.48 | 7.23 |

**THE SYSTEM**

**Basic Telecommunications Infrastructure in the Caribbean**

Infrastructure in the Caribbean is generally considered good, according to the Issuer, but unevenly distributed and expensive to use. Fixed telephone penetration, an index often used to measure the state of development of telecommunications infrastructure, in the 24 countries and territories in the region for which the International Telecommunication Union gathers statistics, varies between 85 % in the Cayman Islands and 1.7 % in Haiti.

There are approximately 90 licensed mobile operators in the Caribbean region and there is competition in the majority of the countries and territories, with most having two, three or even four operators. A few countries have as many as seven license holders. Not all of these may, however, be operating. There are currently 20 fiber optic submarine cable systems in the Caribbean. Of these fourteen primarily serve the region. The other six serve other regions (mainly South America) but have landing points in the Caribbean. The combined total capacity of the thirteen "Caribbean" cables is about 70 Gbps. Their combined potential capacity, however, is nearly 3 Terabits/second (Tbps) due largely to the huge potential capacity of the ARCOS-1 (America's Region Caribbean Optical-ring System) cable system.

While the existing and potential capacity is enough to serve the needs of the region, not all countries have equal access. Of some 24 countries and territories in the Caribbean more than half have access to only one cable system, which for nine of them is the older (1995) Eastern Caribbean Fiber System. In the other countries, where more than one cable lands, users may not have many options because a single operator has the landing licenses. Limited access to these systems results in higher prices for bandwidth capacity. Even though many of these cables are owned by a consortium of operators and a member of a consortium may have capacity up to a cable landing point, it may be difficult to offer a full (end-to-end) cable circuit at competing prices, because the cost for leasing the local loop between the cable landing station and the customer's premises may be prohibitive.

Several systems either recently been completed (FibraLink which connects Jamaica and the ARCOS cable landing station in the Dominican Republic), or are currently under construction (Antilles Crossing which will connect Barbados and St. Lucia with the Global Crossing cable landing point in St. Croix and the Global Caribbean Cable which will connect Guadeloupe and Puerto Rico) or in the late planning (Trans-Caribbean Cable Company (TCCC) is planning a cable which will connect Haiti, Jamaica and the Dominican Republic with the NAP of the Americas in Miami which it is later planned to extend to Aruba, Venezuela and Colombia).

There are currently 34 geostationary satellite systems with a footprint over the Caribbean. These have a combined total transmission capacity of 55.8 GHz but that capacity is not available for all countries and territories in the region.

*Market Structure Prior to Reform* Until recently most telecommunication services (basic fixed and mobile telephone, both domestic and international and value-added including Internet) were provided primarily by monopoly operators in the Caribbean. In the English-speaking Caribbean, Cable & Wireless (C&W) was and continues to be the predominant investor in the telecommunications sector owning between 49% and 100% of the telephone companies in these countries and territories, directly or through the fully owned Cayman Islands based subsidiary Cable & Wireless (West Indies). More recently Digicel, a new entrant in the mobile market in sixteen Caribbean Countries, has gained significant market share from C&W. These monopoly operators often had long term exclusive licenses whose terms, in the judgment of the Issuer, favored the foreign strategic investor and not the government or the population, in that that paid little or no taxes and were exempted from rules concerning the hiring of foreigners, and tariffs were generally not regulated. The telecommunication laws in most of these countries were old and in need of revision. Some predated the Second World War and only applied to the radio frequency spectrum or more specifically the licensing of equipment that uses the radio frequency spectrum.

In February 1997 seven countries (Antigua and Barbuda, Belize, Dominica, Dominican Republic, Grenada, Jamaica, and Trinidad and Tobago) made commitments at the conclusion of the WTO's negotiations on basic telecommunications (NGBT); however, with the exception of the Dominican Republic these were necessarily modest allowing immediate competition only in some value added, internet, and other non-basic services because of the near

27

exclusive arrangements these countries had with the exclusive suppliers of telecommunications services at the time. They all committed to open competition once the periods of exclusivity ended.

*The Current Situation* By the end of 2005 in the English speaking Caribbean Jamaica, Barbados, Belize Trinidad and Tobago and the five Organization of Eastern Caribbean States (OECS) had implemented new legal and regulatory frameworks, which included the establishment of independent national regulators and, in the case of the OECS, national and one regional regulator. With the exception of Montserrat, There are five British Overseas Territories: Anguilla, British Virgin Islands, Cayman Islands, Montserrat and Turks & Caicos,. With the exception of Montserrat,, these territories have each passed new laws and had or were in the process of licensing competing operators. In the non English-speaking Caribbean, Suriname established an independent regulator by decree in 1998 but which had not yet been given effect even though a new Telecommunications Act was passed by Parliament in September 2004. The Dominican Republic passed the new telecommunications law in 1998 which, inter alia, established the independent regulator, Instituto Dominicano de Telecomunicacione. Haiti has maintained a structure similar to the one it had in 1997.

*Pricing Issues.* Because of the lack of competition, international calls in the Caribbean may cost up to 30 times the cost of calls in North America. Intra-Caribbean rates are as expensive as rates for calls made from North America to the Caribbean. Even in Jamaica where new entrant, Digicel, has taken significant market share from the incumbent Cable & Wireless in mobile services, it can cost seven times more than making a call to the same international destination from North America; however, monthly line rental and local calling charges in most Caribbean countries are by comparison low.

While it is presumed that competition will drive down the price for international calling, the high cost of leased circuit capacity has been and continues to be a serious impediment to the establishment of the information society in the Caribbean. Because of the lack of competition the price of a T1 (1.544 Mbps) lease between Trinidad & Tobago and Miami costs about 15 times more than the lease of an E1 (2.048 Mbps) between Amsterdam and Madrid, a little more than half the distance, when compared on a per Mbps basis for a comparable capacity lease. It is not surprising, therefore, that consumers have to pay double or triple for dial up or high speed internet access than consumers in North America.

**Basic Telecommunications Infrastructure in St. Maarten**

Within St. Maarten, the major international telecommunications provider is SMITCOMS; the major wire-based telecommunications provider is TelEm; and the major cellular telecommunications provider is TelCell.

**SMITCOMS**

SMITCOMS was established on May 10th, 2000, as a limited liability company under the laws of the Netherlands Antilles, with its official place of registration on Sint Maarten, Netherlands Antilles and business licenses on the neighboring Netherlands Antilles islands of Saba and Curacao. Prior to the consolidation of telecommunication functions, the shareholder of SMITCOMS was the Government. Since the consolidation, the shareholder of SMITCOMS has been the Issuer. The Shareholder and the Supervisory Board of Directors appoints SMITCOMS' Managing Director

SMITCOMS' primarily role is to develop telecommunication products and services in connection with international communications. Specifically, SMITCOMS, in cooperation with its affiliates and sister companies, was established to:

- Provide a high grade, competitively priced telecommunications services to its subscribers, implement proven technologies via its international telecommunications network; while also supporting the development of the telecommunication sector in becoming a pillar of the economic system of The Netherlands Antilles and the surrounding Islands.

In 2000, a private international telecommunications services company in Sint Maarten accounted for approximately 90% of all outbound calling volume, while local entrepreneurs accounted for the remaining 10%. As of August 2005, SMITCOMS accounted for 67% of Sint Maarten's outbound calling volume and 67% of the island's business and residential fixed phone lines installed.

In 2003 SMITCOMS established an affiliated Company, SMITCOMS Inc, incorporated under the laws of the state of Delaware in the United States. SMITCOMS, Inc. has subsequently attained a U.S. Federal Communications Commission 214 license, enabling SMITCOMS to provide certain international telecommunications services in the United States and Puerto Rico.

SMITCOMS Inc. also holds the St. Maarten-Puerto Rico Cable System undersea fiber optic cable ("SMPR-1") landing license and permits in Puerto Rico. SMITCOMS is presently one hundred (100%) shareholder of SMITCOMS Inc. However, SMITCOMS intends to complete a spin-off of 76% of its ownership interest in SMITCOMS Inc, and retain 24% ownership. Under this revised ownership structure, SMITCOMS anticipates that SMITCOMS, Inc. will become the Caribbean region's premier interconnecting vehicle to the United States and other interconnecting facilities in the USA territories.

*Figure 3: SMPR-1*



In December 2004, Phase 1 of SMPR-1 was commissioned and accepted for commercial service. SMPR-1 is an 8-pair submarine fiber-optic cable that connects Sint Maarten and Puerto Rico. The cable provides high capacity bandwidth expansion at relatively low cost. There are two landing points on Sint Maarten. (Six fiber pairs land on Sint Maarten, the Dutch side of the island, while two fiber pairs land on St. Martin, the French side).

Total cost for designing, installing and bringing SMPR-1 on-line was $16.9 million. Two fiber pairs were sold to Dauphin Telecommunications prior to installation of the cable for $2.7 million under an Indefeasible Rights of User ("IRU") contract, thereby resulting in a net cost of $14.2 million.

SMPR-1 is owned by SMITCOMS, Inc. An agreement between SMITCOMS, Inc. and SMITCOMS NV allocates 75% of SMPR-1's capacity to the SMITCOMS, Inc., and reserves 25% of the capacity for SMITCOMS NV's own use. As capacity is used, only one additional fiber pair needs to be lit at a time. SMITCOMS, Inc. can resell the fiber capacity it owns via an IRU, while SMITCOMS NV has use of the remaining 25% of the capacity.

It is SMITCOMS' vision that in the next 3-5 years, most communications networks will be based on internet protocol ("IP"), and that broadband networks, such as Wireless Fidelity ("WiFi"), WiMAX (an air interface standard for fixed broadband wireless access ("BWA") systems employing a point-to-multipoint architecture), Code Division Multiple Access ("CDMA") broadband, Digital Subscriber Line access ("DSL") and Asymmetric Digital Subscriber Line access ("ADSL"), will become integral parts of the services being provided throughout the region. These services are expected to take away from voice traffic; however, at the same time, they will demand higher use of bandwidth per user.

It can be expected that resellers offering voice over the internet service ("VoIP") could potentially become a source of direct competition. VoIP resellers are currently offering VoIP services to customers on Sint Maarten. The Issuer has indicated that further introduction of VoIP in the network of Sint Maarten by third party resellers would considerably influence the international telephone tariff structures and could force SMITCOMS to revise core marketing and development strategies.

*Current Customers.* At the present time, Internet Services Providers ("ISPs") serving Sint Maarten represent the SMITCOMS's predominant customer base

### SMITCOMS, NV.
### Major Customers

| Customer | Type Business | Leased Line Size | MRR* |
|---|---|---|---|
| TelNet | ISP | STM-1 | $ 55,000 |
| CaribServe | ISP | STM-1 | 54,552 |
| E. Olive Capital Group | ISP/Carrier | DS3 | 44,000 |
| Dauphin | Carrier | DS3 | 36,000 |
| Inteliglobe | Telecom | (2) E1 | 10,889 |
| UTS | ISP/ Carrier | (4) E1 | 9,200 |
| Carib Cable Anguilla | ISP/Carrier | (8) E1 | 8,000 |
| Netstar | ISP | E1 | 6,073 |
| The Windward Islands Bank | Bank | 512 kbps & 64 kbps | 4,122 |
| Scarlet | Carrier | E1 | 3,216 |
| Network Professionals | IT | 1 Mbps | 2,117 |
| Impsat | Telecom | 512 kbps | 1,657 |
| Kooyman | Retail | 512 kbps | 1,268 |
| SOAB | Accounting agency | 512 kbps | 803 |

\* Monthly Recurring Revenue

Shortly after the acceptance of Phase 1 of the SMPR-1 project, work commenced to prepare for Phase 2 of the project. SMITCOMS' Phase 2 cable system consists of four segments connecting St. Maarten and the SMPR-1 System to the islands of Sint Kitts, Anguilla, St. Croix and Antigua.

A Memorandum of Understanding ("MOU") has been entered into among the following parties:

▪ *Antilles Communications Inc.*, a local cable operator in Antigua, British West Indies;

▪ *Weblinks Limited*, an Internet Services Provider, located in Antigua;

- *SMITCOMS N.V.*; and

- *Carib Cable Anguilla*, a local cable service provider, ISP, and company licensed to provide local and international telephone service on Anguilla and Nevis.

The respective parties to the MOU expressed their interest in planning the construction, operation and maintenance of a proposed digital fiber optic cable system connecting Anguilla, Antigua, Sint Maarten, and St. Kitts & Nevis. Additionally, all parties to the MOU have started submitting their request for landing permits in their respective Island territories.

SMITCOMS has received a proposal from NSW, a division of Corning Glass Corporation, to supply and install the fiber optic cable networks to connect Sint Maarten with Anguilla, Sint Kitts & Nevis, Antigua and Sint Croix.

***Figure 4: Proposed Cable Expansion***



The pricing environment in the overall submarine cable market is distinct from the market served by SMITCOMS (both currently and with the proposed expansion). The Sint Maarten market and the islands served by the expansion currently are characterized by the Issuer as expensive by international standards, since there has historically been only one cable provider to these islands. Since coming on line in early 2005, SMPR-1 has used its competitive cost structure to introduce lower priced connectivity services on the Sint Maarten-Puerto Rico route, while attempting to maintain attractive profit margins.

Future price erosion will depend on SMITCOMS, Inc.'s pricing strategy or a competitive cable entering the market. SMITCOMS has determined that it is unlikely that a new operator will directly overbuild SMPR-1. There are many islands in the Caribbean without a broadband cable access. The return on investment on a cable project to an underserved island should, in SMITCOMS's judgment, in nearly all cases be higher than overbuilding a new cable.

*Broadband Cable Access*. There are two main jumping off points in the Caribbean for broadband cable traffic outside of the region—Puerto Rico and St. Croix. SMPR-1 currently provides Sint Maarten with a connection to Puerto Rico. The CFCN-1 expansion system to the second regional hub at St. Croix will add redundancy to the network and access to other networks.

31

The major cable serving Puerto Rico is ARCOS-1.  This cable provides Sint Maarten with a connection to the mainland United States in Florida,  ARCOS-I, is a 9000-km ring linking the Bahamas, Belize, Colombia, Costa Rica, Dominican Republic, Guatemala, Honduras, Mexico, Netherlands Antilles (except Sint Maarten), Nicaragua, Panama, Puerto Rico, Turks and Caicos, United States and Venezuela.  Commercial operation began in late 2001.

The ARCOS-1 system includes 24 segments, and nearly half of the fifteen countries have two or three landing points. It is a hybrid cable, with both unrepeatered and repeatered segments. The shorter segments use 12-fiber pair cable and range from 100 to 380 km in length. The two repeatered segments are about 1000 km and have cable with 3-fiber pairs. These longer segments lie between Florida and Mexico and between Curacao and Puerto Rico; they have a maximum capacity of 960 Gbps, the same as for unrepeatered sections.

ARCOS-1 lands in Isla Verde, Puerto Rico, providing a convenient connection point for SMPR-1 to the rest of the world through ARCOS-1 and the United States.

*Competition*. Sint Maarten has had limited access to telecommunications in part due to geography and in part due to the historical regulation of telecom services by the island government.  This situation has been similar for most islands in the Caribbean. Historically there has been only one supplier of communications in the region.  The Issuer anticipates that SMITCOMS, Inc. has the opportunity to be that supplier for the next generation of fiber optic cables.

The earliest communication system was a microwave system, Eastern Caribbean Microwave System, which was installed in 1972.  In 1991, a digital system was installed, the Digital Eastern Caribbean Microwave System, DECMS.  The Eastern Caribbean Fiber System was installed in 1995.  This 10-year old system is still the main provider of bandwidth in the region and the only submarine fiber cable serving most of the islands.

Satellite links are available to the region including direct broadcast satellites.  The capacity on these systems is limited and comparatively expensive.  Besides Satellite, the only way to get traffic out of St Maarten and the Lesser Antilles region of the Eastern Caribbean is the undersea cable ECFS (Eastern Caribbean Fibre System).  ECFS follows the chain of islands in the Lesser Antilles.  It connects the following islands:  British Virgin Islands, Anguilla, St. Martin, St. Kitts, Montserrat, Antigua, Guadeloupe, Dominica, Martinique, St. Lucia, Barbados, St. Vincent, Grenada and Trinidad and Tobago.

The cable has two fiber pairs with a capacity of 622 Mbps each and is repeaterless. It came online in 1995. The cable is owned by a consortium which includes Cable and Wireless, AT&T, France Telecom, Telecom Services of Trinidad and Tobago ("TSTT") and the Barbados External Telecommunications Company.

*Additional Cable Projects under Consideration*. Several cable projects are being considered for the Caribbean region. Some of these projects could potentially compete with SMITCOMS' cable system, if they were successfully launched in the relative near term.  However, the Issuer is not aware that any these projects have been able to secure financing.

Three such projects include Calypso-1, EC-1 and WIN-1.   Most of these proposed cables would serve the island chain stretching from Puerto Rico to Trinidad and Tobago.  If these cables are indeed launched, SMITCOMS Issuer believes they will purchase IRU contracts on SMPR-1 to provide capacity on the Sint Maarten to Puerto Rico route.  If one of the more extensive cables is built, it could be a substantial positive for the SMITCOMS, Inc.  In effect, SMPR-1 would backhaul the traffic for the entire Lesser Antilles island chain.  The industry journal, Telecom Finance, has reported that this is the case for EC-1.   This project is now exploring capacity on SMPR-1 for the Sint Maarten/Puerto Rico leg of its project.

Calypso-1. This proposed cable is planned to have two stages.  The first stage, connecting Barbados to Trinidad, Guyana, Suriname French Guiana and North Eastern Brazil, and the second phase, would possibly compete more directly with SMPR-1 and SMPR-1 Expansion.  This second phase would connect Barbados to Puerto Rico, via Grenada, St. Vincent, St. Lucia, Martinique, Guadeloupe, Antigua & Barbuda, St. Kitts, and St. Maarten.  The footprint of phase 2 almost completely replicates the coverage offered by SMPR-1 and SMNW-1. The proposed network is for a

32

six pair cable with each wavelength connection at 2.5 Gbps. The capacity without DWDM would be 15 Gbps. Using DWDM, the capacity would be close to 1 Tbps.

Should the second phase of Calypso-1 be installed and come on line it could potentially significantly impact the revenue and pricing for SMITCOMS, Inc. and SMPR-1.

East Caribbean-1. This cable is proposed by the Island Fibre consortium. Their proposed project would follow the chain of islands down the Lesser Antilles chain. Island Fibre was formed in December 2001 as a result of 14 Caribbean Carriers forming the Island Fibre Consortium to build a new network across the Eastern Caribbean. In order to organize the financing and management of the Eastern Caribbean Cable (EC-1), Island Fibre Holding S.A. was formed. Island Fibre Holding S.A. is owned by The DataState Group, Kelcom International, and Dauphin Telecom.

The EC-1 cable would connect the islands of: Trinidad, Grenada, St. Vincent, Barbados, St. Lucia, Martinique, Dominica, Guadeloupe, Antigua, St. Kitts, St. Martin and will connect Puerto-Rico and Jamaica through existing cables.

WIN-1. The proposed route of WIN-1 is from San Juan, Puerto Rico to Trinidad & Tobago, United States Virgin Islands, British Virgin Islands, Anguilla, St. Maarten, St. Kitts & Nevis, Antigua, Guadeloupe, Dominica, Martinique, St. Lucia, Barbados, St. Vincent and the Grenadines, and Grenada. It appears that this proposal is no longer being pursued.

*Target Markets.* SMITCOMS is primarily targeting customers on the island territory of Dutch Sint Maarten by provisioning competitively priced international communications access to customers who currently have limited access to telephone services. SMITCOMS, Inc. however, is targeting broadband customers located on neighboring islands in the Eastern Caribbean region. Initially, SMITCOMS, Inc. will target four island territories that are nearest to its home base island of Sint Maarten, including: St. Kitts, Anguilla, Antigua and St. Croix.

Sint Maarten: The Netherlands Antilles consists of two island groups and five islands in the Caribbean. The two largest islands in terms of population are Curacao and Bonaire and are off the coast of Venezuela in the south Caribbean. The other island group consists of Sint Maarten, Saba and Sint Eustatuis. Sint Maarten is on an island shared with Saint-Martin, which is part of France. The population of Sint Maarten is 41,000 and the population of Saint-Martin is 36,000. (The total population of the Netherland Antilles is approximately 220,000). SMITCOMS, Inc. does not have a cable serving Curacao and Bonaire. They do provide a connection via ARCOS-1 in Puerto Rico.

Sint Kitts (also/previously known as Saint Christopher) is an island in the Caribbean. St. Kitts constitutes the nation of Saint Kitts and Nevis with the island of Nevis. It has a land area of about 65 sq. miles and a population of over 45,000. The main language is English, and the literacy rate is approximately 98 percent.

Antigua is an island in the Caribbean, part of the state of Antigua and Barbuda. It has a population of about 65,000, of which over 24,000 live in the capital of St. John's, on the northwest coast. Antigua is located south of the country's other island, Barbuda.

Anguilla is an internally self-governing British overseas territory. There are approximately 13,000 inhabitants. Its current major settlements include The Bottom, Windward Side, Hell's Gate and St. Johns. Despite the island's Dutch affiliation, English is the principal language spoken on the island and has been used in its school system since 1986. A medical school on the island adds as many as 300 residents when classes are in session.

Saint Croix is one of the United States Virgin Islands, a United States territory, in the Caribbean. It is the largest of the U.S. Virgin Islands. There are two towns on the island; Christiansted with a 2004 population of 3,000 and Frederiksted with a 2004 population of 830. The total population of the island is about 50,000. St. Croix is home to HOVENSA, one of the worlds largest oil refineries.

*Broadband Demand Drivers.* Industry analysts suggest that market demand does not support the construction of additional fibre capacity on an intercontinental basis either across the North Atlantic or North Pacific or between North and South America.

While detailed statistical data are not available, the Issuer believes demand in the Caribbean region in general, but particularly in the Eastern Caribbean, exceeds current installed capacity. Several companies (e.g., Americas, Global Crossing, New World Networks – ARCOS, Antilles Crossing) have already made large investments in undersea fiber networks within the region. These investment decisions were predicated on the belief that there is significant demand and sufficient price elasticity in the market to generate reasonable investment returns.

Future broadband growth will be driven by multiple factors, including:

- ▪ Greater Internet penetration, for example from residents, businesses and tourists;
- ▪ Next generation wireless technologies;
- ▪ Increased usage of Wi-Fi, WiMax and other wireless access technologies.

At the present time, internet traffic dominates international telecom routes. However, in Sint Maarten, for example, internet usage was not significant prior to the installation of SMPR-1. Within a year of installation, however, internet traffic already accounted for more than half the traffic on SMPR-1, and the Issuer believes that its plans to expand competitive priced broadband capacity will further stimulate growth in internet traffic throughout the Eastern Caribbean region.

Voice traffic is a mature, slow growing market. However, management believes that continued growth in VoIP-based internet traffic, as well as backhaul demand derived from the increased use of streaming audio, streaming video and video downloads, will further stimulate broadband demand.

**TelEm**

The Sint Maarten Telephone Company N.V. is the landline telephone service provider serving business and residential clients on the island of St. Maarten. TelEm is charged with maintaining the local fixed telecommunications backbone. TelEm maintains a monopoly in providing fixed telephone lines.

Services provided by TelEm include:

- Fixed and Wireless landline services
- Public telephones
- PBX sales
- Directory services
- Phone card sales
- Leased lines
- Value-added Services

In connection with the reorganization, TelNet will merge into TelEm, and the activities previously performed by TelNet will be the responsibility of TelEm.

TelNet, originally incorporated in 1997, has been the main Internet Service Provider on St. Maarten is sister company., TelNet provides high-speed DSL internet service to residential and business clients with available telephone lines, and wireless internet service to residential and business properties where access to a landline may be limited.

TelNet offers:

- Internet Dial-Up Internet packages
- DSL-High Speed Internet
- Internet Access from any telephone
- Free Spam filtering
- Extra e-mail storage space
- Development of WebPages

- Cyber cafes
- Bandwidth reselling
- Data line services

**TelCell**

TelCell began operating in September 1998, as part of TelEm. At that time, TelCell became the first mobile provider on the island to offer digital services. A year later, the company offered prepaid services to the market under the label TC prepaid services. In 2000, TelCell became the only mobile provider in the region to offer both Time Division Multiple Access ("TDMA") and Global System for Mobile Communication ("GSM"), with the introduction of GSM prepaid services. TelCell now has approximately 23,000 subscribers divided among the company's four customer groups; GSM prepaid, GSM post paid, TDMA prepaid, TDMA post paid. TelCell is currently investing in GPRS technology

TelCell has secured roaming agreements with French partners Amigo (Dauphin), and provides seamless and total island coverage for subscribers on both sides of Dutch and French St. Martin. This service was further extended to include the Netherlands Antilles islands of Saba and St. Eustatius.

TelCell also has secured roaming agreements with more than 55 partners worldwide, including North America, Europe, Asia, the Eastern Caribbean and a number of countries in South and Central America.

TelCell offers:

- GSM mobile service
- TDMA mobile service (pre and post paid)
- Value Added Services ( Caller ID; Call waiting; Call forwarding; 3-way calling; Voice mail).
- Short Messaging Service
- On-line payment service

## LEGAL OPINION

**Opinion of Counsel**

Legal matters relating to the authorization, execution, delivery and validity of the Trust Deed will be subject to the approval of Duncan & Brandon, Attorneys at Law, Phillipsburg, St. Maarten, Netherlands, Antilles, counsel for the Issuer.

## LITIGATION

As described herein under "SPECIAL FACTORS—Competition" licensed common carriers, as part of the condition to issuance of a license or concession, are often required to provide telecommunication connections and capacity to competitors, but are generally entitled to recover the costs of those connections and services from those competitors. However, in St. Maarten, there are no government procedures for the establishment of rates for such connection costs, or the capacity at which those rates are applied. Disputes have therefore arisen concerning the standards for cost recovery, and, as such, the amounts owed to the Subsidiary Companies from entities which may be competitors, and the amounts owed by the Subsidiary Companies to such entities, remain unclear in several instances. As a result of such disputes, TelEm is presently involved in separate litigation with, UTS/Antelecom N.V., Radcomm N.V. and East Caribbean Cellular N.V ("ECC"). Amount in dispute total (i) as to UTS/Antelecomm, approximately $465,615 in receivables and $174,588 in payables, (ii) as to Radcomm N.V, approximately $2,093,799 in receivables and

35

$1,023,529 in payables, and (iii) as to ECC, approximately $1,058,849 in receivables and $3,339,048 in payables. The dispute has led to the filing by ECC of several liens on TelEm property located on Sint Maarten. The claim amount on which the liens are based is approximately $1,100,000.

In addition, a dispute arose between the Government and TelEm with respect to certain charges TelEm claimed were due from the Government, totally approximately $3,890,000. Negotiation on a settlement amount has been ongoing, but the Government's original proposed settlement (approximately $420,000) was refused by TelEm.

At the time of original delivery of the Bonds, there will be furnished a certificate signed by the Issuer stating, among other things, that there is no litigation then pending, or to the knowledge of the officer executing the Bond, threatened, affecting the validity of the Bonds.

## LIMITED OFFERING

The Bonds are being sold pursuant to a Limited Offering.  The Bonds are offered for the sale at the prices or yields set forth on the cover page of this Limited Offering Memorandum.

## RATINGS

The Issuer has not applied for a formal rating on the Bonds or any other obligations payable from Net Pledged Revenues, and no rating is anticipated in connection with the Bonds

## MISCELLANEOUS

As to various items of information included in this Limited Offering Memorandum, the Issuer have attempted to obtain accurate information from governmental authorities and other sources that were believed to be reliable.  However, the Issuer does not warrant the completeness or accuracy of any information so obtained.  The references in this Limited Offering Memorandum to the Trust Deed, statutes, resolutions, contracts and other documents are brief summaries of certain provisions of those documents.  These summaries do not purport to be complete, and reference is made to the documents for full and complete statements of their provisions.  All estimates used in this Limited Offering Memorandum are intended only as estimates and not as representations.

**APPENDIX A**

**FORMS OF DOCUMENTS**

**APPENDIX B**

**Financial Statements**